[No. S027730. Aug. 6, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIA DEL ROSIO ALFARO, Defendant and Appellant.

COUNSEL

Karen L. Snell and Nanci L. Clarence, under appointments by the Supreme Court; Clarence & Snell and Anne W. Lackey for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Laura Whitcomb Halgren and Kyle Niki Cox Shaffer, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

GEORGE, C. J.—A jury convicted defendant Maria Del Rosio Alfaro of the first degree murder of Autumn Wallace (Pen. Code, § 187)[1] (count I), first degree residential burglary (§§ 459, 460.1) (count II), and first degree residential robbery (§§ 211, 212.5, subd. (a)) (count III). The jury also found true the special circumstance allegations of robbery murder and burglary murder (§ 190.2, former subd. (a)(17)(i), (vii)) and the allegation that defendant personally used a deadly weapon (a knife) in the commission of the murder.

The first penalty phase trial ended in a mistrial. After a retrial as to penalty, a jury returned a verdict of death. The trial court denied the automatic motion to modify the penalty (§ 190.4, subd. (e)), stayed imposition of sentence on counts II and III, and imposed a sentence of death. Defendant's appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. STATEMENT OF FACTS

### A. *Introduction*

A jury found that defendant murdered nine-year-old Autumn Wallace on June 15, 1990, in the course of committing a burglary and a robbery at the Wallace home. Autumn's body was discovered in the bathroom of the home, stabbed more than 50 times. Defendant was a high school friend of the victim's sister, April Wallace, and resided approximately three blocks from the Wallace residence. DNA testing revealed that blood found on the bottom of defendant's shoe was consistent with Autumn Wallace's blood and not consistent with defendant's blood. Additionally, shoe prints and fingerprints found at the murder scene connected defendant to the murders. Upon her arrest, and after waiving her rights to an attorney and to remain silent, defendant confessed to the murder. Defendant did not testify at the guilt

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

phase of the trial, but argued that the man who had driven her and a coconspirator to the Wallace residence had pressured her to murder Autumn under threat to the lives of defendant and her family.

Defendant's first penalty phase trial, at which she testified, ended in a mistrial. At the penalty retrial, defendant did not testify but presented evidence of her impoverished and violent childhood, her history of drug abuse, and her impaired mental state. Defendant's testimony from her first penalty phase trial was read to the jury.

### B. *Procedural History*

Following a preliminary hearing held in mid-November 1990, at which no affirmative defense was offered, defendant was held to answer in the Orange County Superior Court. In an information filed in late November 1990, the Orange County District Attorney charged defendant in count I with the June 15, 1990 murder of Autumn Wallace in violation of section 187, subdivision (a). Defendant was charged in count II with first degree residential burglary, in violation of sections 459 and 460.1, and in count III with first degree residential robbery in violation of sections 211 and 212.5, subdivision (a). The information further alleged that defendant personally used a deadly and dangerous weapon (a knife) during the commission of all three charged offenses within the meaning of section 12022, subdivision (b). The information further alleged two special circumstances—that the murder was committed while defendant was engaged in the commission of a robbery (§ 190.2, former subd. (a)(17)(i)), and that the murder was committed while defendant was engaged in the commission of a first degree burglary (§ 190.2, former subd. (a)(17)(vii)).

Defendant entered a plea of not guilty to each count and denied the special circumstances and weapon allegations. Prospective jurors were sworn, and opening statements commenced in mid-March 1992. Nearly two weeks later, the jury found defendant guilty as charged and found true the knife-use and special circumstance allegations. The first penalty phase trial began in late March 1992. The court declared a mistrial as to the penalty phase in early April 1992 after it determined there was no reasonable probability that the jury would be able to reach a verdict. (§ 1140.)

Prospective jurors were sworn, and a second penalty phase trial commenced in mid-May 1992. The jury determined early in June 1992 that defendant should be sentenced to death.

The trial court denied defendant's motions for modification of sentence and for new trial, sentencing defendant to death and ordering that imposition of

sentence on counts II and III for the burglary and robbery convictions be stayed pursuant to section 654. Defendant's appeal is automatic. (§ 1239, subd. (b).) She requests a stay of execution.

### C. *Guilt Phase Evidence*

Autumn Wallace, the murder victim, was nine years of age. She resided with her mother, Linda Wallace, a clerk employed by the Orange County Superior Court, her older sister April Wallace, and April's infant son on Hedlund Street in Anaheim, California. Autumn's friend, Christina S., testified that their school had an "early day" on Friday, June 15, 1990; school recessed at 2:35 p.m., and about that time she and Autumn left school and went to Autumn's home.

Three of the Wallaces' neighbors testified that on the afternoon of Autumn's murder, they each separately observed a "reddish" or "goldish-bronze" Monte Carlo parked in the driveway of the Wallace residence and two Hispanic men standing nearby facing the street. One of the men was holding a child, approximately 18 months of age. The man with the infant subsequently was identified as Antonio "Shorty" Reynoso.

April Wallace testified that she attempted to telephone Autumn at approximately 4:30 p.m. to inform Autumn that she would arrive home late from work, but Autumn did not answer the phone. April returned to the residence at approximately 5:15 p.m. and found the front door locked. She entered and observed the residence was in a state of disarray. The hall closet was open and things were "scattered around." April called out for Autumn but received no answer. When April entered her bedroom, she noticed that her television and mirror were missing and some clothing had been thrown around. April immediately left the residence and went across the street to a neighbor's home.

At approximately 5:40 p.m., Linda Wallace arrived at the residence and was informed by April that the house had been burglarized and that Autumn was missing. Linda entered in search of Autumn and noticed that many items were missing. Unable to locate a telephone in the house, Linda instructed April to telephone the police from another location. While April ran to a neighbor's residence to make the call, Linda searched her home and discovered Autumn's body in the back bathroom.

Defendant was a high school friend of April Wallace's and resided approximately three blocks from the Wallace residence. In the course of her friendship with April, defendant visited the Wallace home on many occasions and resided there for a short time while pregnant with her second child. April

testified that after 1989, she and defendant ceased to be friends because April doubted defendant's veracity. Defendant nonetheless continued to contact April to request that she drive defendant to various destinations.

Orange County Sheriff's Department Investigator Tom Giffin testified that he arrived at the Wallace residence approximately 7:20 p.m. on the night of the homicide. Approximately 11:15 p.m., defendant, her boyfriend Manuel Cueva, and their son Manny walked past the Wallace home. Defendant asked Giffin for permission to speak with April, but Giffin declined. Giffin testified that while speaking to defendant, he recalled witness accounts that a small child had been seen in front of the house with two Hispanic men. The following day, after learning that a fingerprint lifted from the Wallace bathroom matched defendant's fingerprint, Giffin conducted an interview with defendant at the sheriff's department substation in Stanton. Defendant denied any involvement in the crimes during this interview.

Sometime after the murder, defendant left a bag of clothing at Maria Ruelas's home, where defendant and Cueva periodically stayed overnight. Ruelas testified that the clothes belonged to defendant. Defendant had telephoned Ruelas and asked her to leave the bag of clothing outside, because defendant was leaving for Mexico early the next morning, but defendant never returned for the clothes. Investigator Giffin obtained the bag from Ruelas on June 24, 1990. When the bag was searched pursuant to a warrant, it was found to contain April Wallace's boots and defendant's LA Gear tennis shoes.

Immediately thereafter, the police obtained a warrant for defendant's arrest, and she was arrested the following day. Shortly thereafter, defendant was interviewed during a videotaped session that lasted more than four hours. In the course of the interview, defendant confessed to murdering Autumn and burglarizing the Wallace residence. Defendant's videotaped confession was presented to the jury. Defendant told the police that on the day Autumn was murdered, defendant was staying at Manuel Cueva's father's home in Anaheim. Defendant was 18 years of age, the mother of two children, and pregnant with twins. Cueva was the father of defendant's younger children. Defendant was addicted to heroin and cocaine, and on the day of the murder she left Cueva's residence approximately 11:00 a.m. to purchase drugs, taking Manny with her. Defendant was driven by an unidentified acquaintance to an area of Anaheim known as "Little Tijuana," where defendant sought out a man named Juan, who was employed with her mother at Disneyland. Juan directed defendant to a nearby apartment, where "some guy downstairs named Huero" was rumored to be selling drugs. Defendant left Manny with Juan at his apartment while she and another woman named Sabrina left to

buy drugs, purchasing two "dime bags" each of cocaine and heroin. Thereafter, defendant and Sabrina returned to Juan's apartment, proceeding to cook and inject the drugs until approximately 2:00 p.m.

Defendant's acquaintance, Antonio Reynoso, who had been released from prison the previous day, also visited Juan's apartment that afternoon. When defendant and Sabrina exhausted their supply of drugs, Reynoso offered to share his own drugs if defendant would share her "rig" (a term referring to the needle, syringe, and other paraphernalia used to inject drugs). After defendant agreed, she and Reynoso injected additional quantities of drugs while Sabrina looked after Manny. After consuming Reynoso's entire supply of drugs, defendant desired to continue taking drugs, but had run out of money.

Thereafter, defendant, Reynoso, and a second man drove to the Wallace home. Defendant told Reynoso that she formerly resided with the Wallaces and was willing to sell Reynoso a videocassette recorder (VCR) that she had left at the residence. Defendant admitted to the police that she knew Autumn would be home alone that afternoon because both Linda and April Wallace were at work. Upon arriving at the Wallace home, defendant told Reynoso to hold her baby son while she entered the residence.

Defendant admitted stabbing Autumn, initially telling the police that shortly after entering the house, she saw a knife on the ground and stabbed Autumn. Later in the interview, defendant told the police that she noticed and picked up the knife, which was on top of the washer or dryer near the rear bathroom, and then called Autumn into the bathroom and stabbed her. Defendant subsequently described taking the knife from a kitchen drawer after Autumn admitted her to the residence. Defendant repeatedly stated that she acted alone in killing Autumn and repeatedly denied that either of the men who came with her to the Wallace residence knew of defendant's plans to burglarize the house.

Defendant told the police she decided to kill Autumn because the child could identify her as the perpetrator of the burglary. She explained that she took the knife into the bathroom with her and for several minutes considered killing Autumn. After calling Autumn into the bathroom, defendant removed some eyelash curlers from her makeup bag and asked Autumn to clean them for her. Autumn agreed to do so, and after she turned around at defendant's request, defendant began to stab her. Defendant told the police she repeatedly stabbed Autumn in the back, chest, and head.

Defendant told the police that she next removed the television set from April's room and a VCR from the living room and carried these items outside

to the vehicle where Reynoso and the driver waited with Manny. Defendant went back inside the house and took a typewriter, mirror, telephone, clock radio, clothing, and pair of boots from April's bedroom. She removed a telephone, iron, lamp, radio, and Nintendo game from Linda Wallace's bedroom, and a clock and a calculator from the living room. Defendant attempted to take a microwave oven but later determined it was too large to fit inside the automobile. Defendant took the knife she had used to stab Autumn with her when she departed from the Wallace residence.

Although defendant consistently maintained that Reynoso remained outside in the driveway with Manny throughout defendant's commission of the homicide and the burglary, defendant was inconsistent during the course of the police interview in describing the whereabouts of the second man. Defendant initially said he exited from the vehicle to help her place the items she had removed from the Wallace residence inside the vehicle but did not enter the house. Later, defendant suggested that the man may have entered the residence. When defendant explained her decision not to take the microwave, however, she implied that the man had gone inside the residence as far back as the rear bedroom.

Defendant told the police that the vehicle driven to the Wallace residence was an older model, dark blue Camaro and that neither she nor Reynoso knew the identity of the driver. The police repeatedly challenged her description of the vehicle, telling her that numerous witnesses had described the car as a goldish-bronze or brown Monte Carlo. Defendant nonetheless repeated that the vehicle was blue and that she did not know the identity of the driver. Despite being afforded numerous opportunities by the police to implicate another person in Autumn's murder, defendant repeatedly insisted that she had acted alone.

At trial, Reynoso testified that he and the driver, whom he did not know and could not identify, remained outside the Wallace residence, in or around the driveway, for approximately 10 minutes until defendant exited from the house carrying some household items. Reynoso testified that neither he nor the driver ever entered the Wallace home. Reynoso confirmed at trial that defendant told him she formerly resided at the house and that he initially believed defendant when she told him she owned the property she had removed from the house. After loading the car, defendant, defendant's son, and Reynoso were driven back to "Little Tijuana" by the second man.

Reynoso variously testified that he decided not to buy the VCR, because he knew it was stolen, and conversely that he had grown angry because defendant had sold the VCR to someone else. Reynoso testified he did not notice any blood on defendant and did not learn about Autumn's murder until

he read about it in the newspaper, at which time he turned himself in to the authorities. Reynoso was asked to identify the driver of the vehicle from a photograph (marked exhibit No. 89), but Reynoso testified that he did not recognize the man in the photograph as the driver.

In attempting to identify the second Hispanic male (other than Reynoso) who had been observed by witnesses outside the Wallace home, police investigators considered more than 100 individuals. The police identified but subsequently eliminated as a possible suspect a man named Robert Frias Gonzales. Investigator Giffin testified that the police pursued this part of the investigation because Giffin had difficulty believing that defendant could have committed the murder alone. Giffin concluded that defendant knew who the driver was but would not reveal his identity.

As noted above, an autopsy revealed that Autumn Wallace suffered more than 50 stab wounds on her head, neck, upper portion of her torso, chest, front, and back. Wounds to Autumn's heart and larynx caused her death. The coroner testified that the angle of most of the wounds suggested they were inflicted contemporaneously, and that a paring knife, discovered on the floor near the murder scene and admitted as People's exhibit No. 61, had a "configuration and appearance" that could easily have caused "most if not all of the injuries." With regard to at least one of the wounds, the coroner could not state positively that it was caused by the paring knife. During the police investigation, Linda Wallace informed the police that a boning knife with a 12-inch blade was missing from her residence.

DNA testing conducted by the Orange County Sheriff's Department crime laboratory revealed that blood found on the bottom of defendant's LA Gear shoe was consistent with Autumn Wallace's blood and was not consistent with defendant's. Several shoe prints found on the linoleum floor outside the bathroom revealed the same general class characteristics as hash marks made by defendant's LA Gear shoes. Additionally, defendant's fingerprints and palm prints matched some of the 26 fingerprints and a palm print discovered at various locations in the house. The paring knife and an eyelash curler were found on the bathroom floor next to Autumn's body.

Defendant waived her right to testify in her own defense, and the defense rested without calling any witnesses. The jury found defendant guilty of the charges and found true the allegation that she used a knife in the commission of the offense, as well as the special circumstance allegations that she committed the murder in the course of a first degree burglary and a robbery.

### D. *Evidence Received at the First Penalty Phase Trial*

At the first penalty phase trial, the prosecution rested after introducing a photograph of the murder victim taken when she was alive.

The defense witnesses testified as follows:

Manuel Cueva, defendant's boyfriend and the father of three of defendant's four children, testified that defendant was the loving and caring mother of four children, two of them twin boys born after her arrest in the present case. Following her arrest, defendant continued to express concern for her children and to write and speak to them.

Janell Laird, a friend of defendant's who had known her since preschool, testified that defendant's father was an alcoholic who often vomited in front of them and struck defendant and her mother. Laird explained that she was afraid of defendant's father, who eventually abandoned the family. Laird testified that defendant was in the sixth grade when she started using drugs. Laird recounted that defendant had written her from jail, telling her of the importance of staying away from drugs and living a law-abiding life. Laird also testified that defendant had telephoned her from jail, telling her that Autumn Wallace did not deserve to die and that defendant never planned to harm her.

Tamara Benedict, a neighbor of defendant's during defendant's childhood, remembered defendant's father as a violent alcoholic. She testified that defendant dropped out of school in seventh grade, at which time she began to run away from home and started injecting "speed balls," a mixture of heroin and cocaine, as often as 50 times each day. Defendant often told Benedict that defendant wanted to quit taking drugs but was unable to do so because of her addiction. Benedict testified that defendant sometimes had sex with her drug dealers in order to obtain drugs, had attempted to "clean up" on multiple occasions, and was able to obtain temporary employment. Defendant wrote Benedict several letters from jail, expressing sorrow for what she had done.

Defendant's mother, Sylvia Alfaro, testified that she worked 10 to 14 hours each day, sometimes seven days a week. She testified that defendant's father was an alcoholic, often struck both Sylvia and defendant in the presence of the other children in the family, and threw the family out of the home during drunken rages. Defendant began to be truant from school at the age of 11 years. Sylvia became aware of defendant's drug problem when defendant was 12 years of age, and thereafter attended counseling with her three to four times a week. Defendant became a prostitute when she was 13 years of age in order to support her drug habit. Thereafter, defendant was sent to reside with her grandmother in Mexico but was returned home within five months, after which defendant's mother often found her on the streets, dirty, hungry, and shoeless. Defendant's father refused to intervene and abandoned the family when defendant was 14 years of age, the same year defendant became pregnant with her first son, Danny.

Sylvia Alfaro further testified that at one point, she placed defendant into a drug rehabilitation program, but defendant was discharged after 10 days because her insurance coverage expired. Although defendant was able to avoid using drugs during her pregnancy, she resumed her drug use three months after Danny's birth. Sylvia testified that she took defendant's children to visit her in jail, and that she would continue to do so in the event defendant were to receive a sentence of life imprisonment without the possibility of parole. Sylvia did not want to see her daughter die.

Dolores Onofre, who had known defendant since she was a child, testified that defendant's father was an alcoholic who had acted violently in the presence of his children and had threatened to kill his wife. Betty Clearly, a manager at a McDonald's restaurant where defendant had worked briefly, testified that defendant was a good employee, dependable and congenial.

Sylvia Archuleta, an employee of a Christian program called Teen Challenge, testified that she met defendant at the Orange County jail. She testified that defendant often cried and expressed sorrow for the grief she had caused the victim's family.

Norman Morein, a sentencing consultant, testified that defendant had adjusted satisfactorily at the county jail and that her confrontation with an inmate, which Morein explained stemmed from the other inmate's discussing defendant's case with prison staff, was natural and expected behavior. Morein testified that defendant expressed genuine remorse and sorrow for the underlying crime, and that she had become religious since being incarcerated. Morein opined that defendant could have a positive influence on other persons if allowed to live.

Dr. Armando Morales, a psychosociologist, testified that defendant had a relatively stable childhood until the age of five years. Thereafter, she was abused by her violent and alcoholic father, was raped at the age of nine years by her father's friend, experienced racism at school, and suffered from drug abuse. Dr. Morales opined that defendant developed emotional problems, including depression associated with trauma, which contributed to her substance abuse. He further believed that in light of defendant's stable early childhood, she was capable of developing close attachments and of being a positive influence on others. Morales testified that defendant felt remorse and empathy for the victim and her family.

Defendant testified at the first penalty phase trial. She told the jury of her unhappy home life, her violent and abusive alcoholic father, the racial prejudice she suffered at school, and her problems with drug abuse. She testified that she began to use "hard" drugs in the sixth grade. She was forced

by economic circumstances to engage in prostitution shortly after becoming addicted to drugs. Defendant testified that she had stolen property to sell in order to pay for drugs. She described the extent of her drug problem and her mother's efforts to address it by placing her into rehabilitation facilities. Defendant also read a letter she had written to Autumn Wallace, expressing her sorrow and remorse for Autumn's death and stating that "we took your innocent life."

The court ruled that defendant's reference to "we" had "opened the door" to cross-examination regarding the circumstances of the crime. During cross-examination, defendant admitted she had murdered Autumn Wallace, but testified she had done so under pressure from the second Hispanic male, whom she referred to as "Beto." She refused to reveal anything more regarding the identity of the second man. She testified she had used cocaine and heroin shortly before going to the Wallace home, and was "out of [my] head." She testified she did not know Autumn would be home and did not plan to harm her. She also testified that Autumn recognized her before letting her into the house, that she gave Autumn her eyelash curlers and asked her to clean them, and that she had brought the curlers into the house because she "wanted to play the part." Defendant testified that "Beto" also was "wired" on drugs, and that upon discovering Autumn in the house, he had become angry, put a knife to defendant's back, and threatened to kill her baby if she did not stab Autumn. Defendant testified she stabbed Autumn "a couple of times" initially, but claimed "Beto" must have inflicted the remainder of the stab wounds found on the victim's body. She testified that when she came down from her "high," she learned—but could not believe—that Autumn was dead.

The prosecutor questioned defendant extensively regarding the identification of "Beto" that she had provided to Dr. Consuelo Edwards, a mental health expert who had examined defendant on behalf of the defense but had not testified. Defendant testified that initially she told Edwards that the third man's name was "Miguel" and that he was a friend of defendant's father, and subsequently that she had told Edwards that the man's name was, in fact, "Beto" and that on his neck a woman's name was tattooed in cursive writing. Defendant identified as "Beto" the man depicted in the photograph marked exhibit No. 89.

In questioning defendant and Reynoso, defense counsel suggested that Robert Frias Gonzales was "Beto." In rebuttal, the prosecution presented witnesses Robert Frias Gonzales and his sister Rosalinda Gonzales, both of whom testified that the police had contacted them and investigated Robert's involvement in Autumn Wallace's murder. Robert Gonzales testified that he is known as "Beto," but explained he was home with his sister all day and night

on the date of the homicide. He was not the man depicted in the photograph labeled exhibit No. 89 whom defendant had identified as "Beto."

Ultimately, the jury at the first penalty phase trial was unable to reach a verdict, and the trial court declared a mistrial.

### E. *Evidence Received at the Second Penalty Phase Trial*

At the penalty retrial, held in April 1992 before a newly sworn jury, Christina S., April Wallace, and Linda Wallace each testified for the prosecution regarding the grief and suffering they had endured as a result of Autumn Wallace's death. The prosecution also introduced testimony from most of the witnesses who had testified at the guilt phase of the trial.

Defendant did not testify. Defense witnesses Manuel Cueva, Janell Laird, Tamara Benedict, Dolores Onofre, Sylvia Archuleta, Sylvia Alfaro, and Dr. Armando Morales testified again, in a manner substantially similar to their testimony at the first penalty phase trial. The defense additionally called the following witnesses.

Marc Taylor, a criminalist retained as an expert by the defense, testified that he examined various items of evidence, including pieces of clothing, bloodstained flooring, shoe prints, blood-spattered furniture, a bloodstained towel, plastic casts of shoe prints found outside the Wallace home, men's and women's LA Gear tennis shoes, boots, and sandals. Taylor testified that some of the shoe prints found inside and outside the house did not match defendant's LA Gear shoes. He testified his tests established that the bloodstains on the towel were caused by the wiping of a knife other than the weapon designated as exhibit No. 61. On cross-examination, Taylor acknowledged that examining blood wipes was not an exact science and that the patterns could have been caused by wiping a belt or a shoe on the towel.

Toby Silver, a registered nurse and mental health professional at the Orange County jail during defendant's incarceration, testified that during clinical sessions, defendant exhibited signs of depression and low self-esteem, stated that she missed her children, and expressed remorse for her crimes.

Kenneth Harer, a deputy sheriff at the Orange County jail, testified that he identified a man named "Beto" as a person who resembled the suspect depicted in a flier posted after the murder. After he saw the flier, Harer remembered that he had seen the same man entering a blue Camaro parked across the street from the main jail.

Gerardo Rangel, a bilingual school counselor who knew defendant while she was a junior high school student, testified that he met with defendant's

mother regarding her absenteeism and performance problems at school. Rangel attempted to help Sylvia Alfaro enroll defendant in drug rehabilitation programs but was unsuccessful because Sylvia could not afford the required fees.

Albert Lopez, a minister with Gleaners, an inmate ministry, testified that he visited with defendant on approximately 20 to 25 occasions at the Orange County jail and believed she exhibited remorse for having committed the crime. On one occasion, Lopez recalled, defendant cried in Lopez's presence, and he believed her sorrow to be genuine.

Finally, defense counsel presented Dr. Consuelo Edwards as a mental health expert witness. Dr. Edwards, a medical doctor trained in Spain, testified extensively regarding defendant's childhood, referring to her abusive father, her drug use, her multiple pregnancies, her limited work as an employee at McDonald's, and her relationship with Manuel Cueva. Edwards described defendant's intellectual functioning as "borderline," opining that she had an IQ of 78 and learning disabilities that were exacerbated by her traumatic experiences as a child. In Dr. Edwards's opinion, defendant was a passive and dependent person with low impulse control, a condition that was further compromised when she was under the influence of drugs. Edwards described defendant as a follower.

Dr. Edwards also testified that although defendant admitted to her that she had killed Autumn Wallace, and defendant described in detail the events preceding the homicide, she refused to answer any questions regarding the second Hispanic male, other than to say he was a friend of her father's named "Miguel." Edwards testified that defendant told her "Miguel" had threatened to kill defendant and her baby unless she killed Autumn Wallace, and that after stabbing the victim four or five times, defendant ran from the room, not having planned to kill her. In a subsequent interview with defendant, Edwards told defendant that her defense attorney had shown Edwards a photograph of "Beto," whom the defense identified as the man seen outside the Wallace residence. At that time, defendant agreed that the man with her on the day of the murder was named "Beto." Edwards testified that defendant had expressed great sorrow for her involvement in the crime.

Edwards was of the opinion that defendant was legally sane at the time of the crime, but was suffering from an ongoing organic mental disorder and was under the influence of drugs, either because of intoxication or withdrawal. Edwards also diagnosed defendant as having attention deficit disorder, learning disabilities, a conduct disorder characterized by childhood antisocial behavior, an adjustment disorder characterized by anxiety and

depression, and a dependent personality disorder. Edwards was of the opinion that defendant was not malingering, and that she possessed the potential for change and improvement.

In rebuttal, the prosecutor presented the testimony of several Orange County jail employees. One employee testified he had seen defendant strike another inmate. Other jail employees testified to having heard her comment during a conversation with another inmate: "I'm a frustrated person who takes things out on people, and have to learn to live with that," and "I'm not going to be able to do this again. I'm no actor. I'm going to be cold this time. I just want to get this over with."

The prosecution presented in rebuttal the testimony of Orange County Sheriff's Department Investigator Robert Harper, who contradicted the defense claim that Robert Frias Gonzales was the person outside the Wallace home identified as Beto. Harper testified that Gonzales had a butterfly tattoo on his neck, but not a tattoo of a woman's name. Investigator Thomas Giffin testified that defense witness Lopez stated he was going to marry defendant when her trial was concluded. The prosecution also called a consulting psychologist, Martha Rogers, who had conducted psychological testing of defendant on behalf of the defense and whose notes and raw data were provided to Drs. Morales and Edwards by defense counsel. Rogers was questioned regarding the meaning of the phrase "probable fake bad," which she had entered in her written notes. As discussed below in detail, Rogers testified that this phrase was susceptible of multiple meanings, among them malingering.

After argument and instructions, the matter was submitted to the second penalty phase jury, which returned a verdict of death.

## II. Discussion

### A. Guilt Phase Issues

#### 1. The Trial Court's Asserted Failure to Address an Alleged Conflict Between Defendant and Defense Counsel Concerning Defendant's Desire to Enter a Plea of Guilty

Defendant contends the trial court erred by failing to address adequately a conflict that arose between defense counsel and defendant concerning her desire to enter a plea of guilty shortly before the commencement of the guilt phase of the trial. Defendant maintains that she repeatedly informed her counsel that she wished to plead guilty but that counsel "unreasonably withheld" consent to a guilty plea and thereafter insisted on presenting a

defense that ultimately proved to be unsuccessful and prejudiced defendant's ability to demonstrate at the penalty phase her remorse and acceptance of responsibility.[2] Defendant asserts that the trial court failed to conduct an adequate inquiry into the alleged conflict between defendant and her counsel regarding her desire to enter a plea of guilty, and that, had such an inquiry been conducted, the trial court would have determined that counsel's refusal to consent was unreasonable. Defendant further asserts that as a result of the trial court's inaction, she was deprived of her right to plead guilty and that such a plea would have enhanced her defense at the penalty phase. Although defendant concedes that the plain language of section 1018 conditions a guilty plea in a capital case upon the consent of counsel, she urges that a trial court nonetheless has a duty to ensure that defense counsel does not unreasonably withhold such consent. Defendant asserts that the trial court's alleged error deprived her of her constitutional right to the assistance of counsel, of control over her own defense, and of her right to a fair trial.

For the reasons that follow, we find no error in the trial court's inquiry into, and resolution of, the purported conflict between defendant and her counsel regarding her plea.

### a. Factual Background

On the day of defendant's arrest in late June 1991, police officers gave defendant *Miranda* advisements (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]), and thereafter she agreed to be interviewed by law enforcement officers without counsel being present. In a four-hour videotaped confession, she assumed complete responsibility for the murder of Autumn Wallace. Defendant described in detail the circumstances of the crimes, including her intention to steal property when she entered the Wallace home, as well as taking a knife from the drawer in the kitchen shortly after entering the residence. Defendant admitted that she inflicted all of Autumn's wounds, specifically acknowledging that no one else participated in the murder and that she knew the wounds she inflicted could cause death.

In mid-February 1992, 11 days prior to the commencement of jury selection, defendant's counsel filed an in camera "request for special instruction" wherein he informed the court: "My client . . . refuses to follow my instructions and take the stand and implicate 'Beto' . . . If my client insists on pleading guilty to the special circumstances, it is against my most vigorous advice. I am requesting instructions from the court as to whether or not the court believes it is necessary for me to withdraw from the case at this late stage or whether or not I should remain on the case."

---

[2] As discussed in detail below, section 1018 provides that no plea of guilty to a felony for which the maximum punishment is death shall be received without the consent of the defendant's counsel.

The following day, the court met with defense counsel, William Monroe, and defendant ex parte. During the lengthy ensuing discussion, Monroe described an "out and out conflict" between himself and defendant regarding her desire to plead guilty and his "wish to proceed to trial on the guilt phase." Monroe told the court that because of fears for the safety of defendant and her family should she implicate "Beto" in the crime, defendant "adamantly refused" to allow counsel to call "Beto" as a witness, to cross-examine Antonio "Shorty" Reynoso pregarding his relationship with "Beto," or to question any other witnesses regarding a possible identification of "Beto." Monroe also informed the court that defendant would not testify and implicate "Beto" in Autumn's murder, because of fears for her safety, and that she sought to plead guilty "against my vigorous, vigorous advice." The trial court explained that pursuant to Penal Code section 1018, it did not have authority to accept a guilty plea from a defendant in a capital trial without the consent of counsel, and accordingly, even if she desired to do so, defendant could not enter a guilty plea without counsel's consent.[3] Ultimately, the court refused to remove counsel from the case, concluding that the asserted conflict between defendant and her counsel was one involving trial tactics and, as such, did not require the removal of counsel or the appointment of new counsel.

Nearly a week after this hearing, defense counsel filed a motion to suppress evidence of defendant's videotaped confession, arguing that drugs affected her judgment and rationality at the time of the confession, and asserting that introduction of the confession would violate defendant's right to counsel, privilege against self-incrimination, and right to due process of law. The court denied the motion, concluding that defendant's statements were voluntary and that the amount of drugs in her system did not affect her ability to waive her rights knowingly and voluntarily.

The trial proceeded, and during cross-examination of the prosecution's witnesses, Shorty Reynoso and Tom Giffin, as well as in his closing argument, defense counsel suggested that "Beto" was a "second killer" who goaded defendant into murdering Autumn Wallace by threatening to harm defendant's family unless she committed the murder (purportedly to eliminate the victim as an eyewitness to the robbery). As expected, the defense rested its case without defendant testifying on her own behalf. A few days later, the jury found defendant guilty on all charges, finding that the murder was of the first degree and that the alleged special circumstances were true.

During both the first and second penalty phase trials, the district attorney told the jury that defendant had not accepted responsibility for the murder

---

[3] Section 1018 provides, in pertinent part, "No plea of guilty of a felony for which the maximum punishment is death, or life imprisonment without the possibility of parole, shall be received from a defendant who does not appear with counsel, nor shall that plea be received without the consent of the defendant's counsel."

and that she lacked remorse. The jury did not hear evidence reflecting that prior to the guilt phase trial, defendant had attempted to accept the prosecutor's offer to enter an unconditional plea of guilty.

### b. *Analysis*

As a threshold matter, the parties vigorously disagree with respect to whether the guilty plea proffered by defendant was conditional or unconditional. Defendant contends that the discussion between the trial court and defense counsel clearly establishes that defendant sought to enter an unconditional plea. The Attorney General maintains, on the other hand, that defendant sought to enter a conditional plea of guilty, that is, she desired to plead guilty in exchange for receiving a sentence of life imprisonment without the possibility of parole—and that this offer was communicated by defense counsel to the prosecutor, who rejected the offer. The Attorney General reasons that because evidence of a desire to plead guilty conditionally (that is, in exchange for an agreement to avoid the death penalty) would not have provided evidence that defendant was remorseful, defense counsel did not render ineffective assistance by refusing to accede to defendant's wish, and the trial court did not err in failing to further investigate the purported conflict.

The record supports the inference that defendant had communicated to her counsel a desire to enter an unconditional guilty plea. The transcript of the in camera proceedings conducted to discuss defense counsel's "request for special instruction" reflects that defense counsel and the trial court discussed defendant's desire to plead guilty to a capital offense and that doing so could subject her to the death penalty. When the trial court asked defendant what she wanted to do, she answered, without any expressed condition, "plead guilty." Defense counsel stated several times that his objection to entry of a guilty plea was based upon his refusal to allow defendant to plead guilty to a capital offense. Counsel stated, "I can't turn around and say I consent to allow my client to plead guilty when I know she's pleading guilty for all intents and purposes to a death sentence," and "A twenty year old child is going to plead guilty to a death penalty?" The trial court, in turn, expressed doubt that any attorney in Orange County "would consent to somebody pleading guilty to a capital offense." The clear inference is that defense counsel withheld his consent to what he perceived as an *unconditional* guilty plea.

Moreover, approximately one week after the foregoing hearing, the prosecution moved to exclude evidence of defense counsel's offer to "allow his client to plead guilty to life without possibility of parole in lieu of the death penalty. In lieu of us seeking the death penalty." Thus, it appears that defense

counsel specifically offered that defendant would plead guilty in exchange for a sentence of life imprisonment without possibility of parole. Accordingly, it is apparent that the conflict between defendant and counsel that was the subject of the in camera discussion concerned defendant's desire to enter an *unconditional* guilty plea and her attorney's refusal to consent to her doing so.

Turning to the substance of defendant's argument, we note at the outset that defendant did not make an unequivocal request to discharge her counsel, William Monroe, and to represent herself. Rather, Monroe himself sought guidance from the court regarding what he feared was an "irreconcilable" conflict. Nonetheless, although defendant acknowledges that she did not herself invoke her right to self-representation under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*), she contends that a defendant's right to self-representation under *Faretta* encompasses a duty on the part of the trial court to ensure that defense counsel does not unreasonably withhold consent to the entry of a guilty plea in a capital case. Reasoning that a defendant has the ultimate, fundamental right to control his or her own defense, and contending that defendant desired to plead guilty in order to establish her acceptance of responsibility that in turn would enhance her penalty phase defense, defendant argues that she had the right to enter an unconditional plea of guilty against the advice of counsel and that the trial court erred in not allowing her to do so.

■ Section 1018, limiting a defendant's right to plead guilty in a capital case, is one of several exceptions to the general rule recognizing " 'the need to respect the defendant's personal choice on the most "fundamental" decisions in a criminal case.' " (*People v. Bloom* (1989) 48 Cal.3d 1194, 1221–1222 & fn. 6 [259 Cal.Rptr. 669, 774 P.2d 698].) Indeed, "it is difficult to conceive of a plainer statement of law than the rule of section 1018 that no guilty plea to a capital offense shall be received 'without the consent of the defendant's counsel.' " (*People v. Chadd* (1981) 28 Cal.3d 739, 746 [170 Cal.Rptr. 798, 621 P.2d 837] (*Chadd*).)

We considered section 1018's consent requirement in *Chadd, supra,* 28 Cal.3d 739, in which we held that the trial court committed prejudicial error in accepting the defendant's plea of guilty without obtaining the consent of his counsel. (*Id.* at p. 746.) The capital defendant in *Chadd* initially pleaded not guilty, but after attempting suicide, he waived his right to a preliminary hearing and through his appointed counsel informed the court that he sought to plead guilty against the advice of counsel.[4] As characterized by the

---

[4] Because the defendant in *Chadd* did not ask to be relieved of counsel, we did not consider the Attorney General's contention that section 1018 permits a capital defendant to discharge his or her attorney, represent himself or herself, and enter a guilty plea. (*Chadd, supra,* 28

defendant's counsel, his " 'basic desire [was] to commit suicide,' " and the defendant was " 'asking for the cooperation of the State in that endeavor.' " (*Id.* at p. 744.) Indeed, when the trial court directly inquired, the defendant in *Chadd* expressly confirmed that he was seeking the court's assistance in committing suicide. The trial court found the defendant competent within the meaning of *Faretta*, reasoning that a finding of competence under that decision justified a departure from the consent requirement of section 1018. Although the court did not officially relieve counsel, it accepted the defendant's guilty plea to first degree murder and his admission of all charged enhancements and special circumstances, despite counsel's continuing objections. Thereafter, a penalty phase jury imposed a judgment of death. (*Chadd*, at p. 748.)

Emphasizing the plain language of section 1018, and concluding the trial court committed prejudicial error in accepting the defendant's plea, we reversed the judgment of death. (*Chadd, supra*, 28 Cal.3d at pp. 754–755.) Although acknowledging that in California's system of criminal justice, the decision how to plead to a criminal charge is personal to the defendant, we also emphasized that "it is no less true that the Legislature has the power to regulate, in the public interest, the manner in which that choice is exercised." (*Id.* at pp. 747–748.) We specifically considered the interplay between the section 1018 consent requirement and the Sixth Amendment right of self-representation discussed in *Faretta,* and observed that, as *Faretta* recognized, the Sixth Amendment grants the right to defend directly to the accused, because he or she suffers the consequences in the event the defense fails. (*Chadd*, at p. 751.) In rejecting the Attorney General's contention that therefore the so-called veto power vested in defense counsel renders section 1018 unconstitutional, we explained that "in capital cases . . . the state has a strong interest in reducing the risk of mistaken judgments. Nothing in *Faretta*, either expressly or impliedly, deprives the state of the right to conclude that the danger of erroneously imposing a death sentence outweighs the minor infringement of the right of self-representation resulting when defendant's right to plead guilty in capital cases is subjected to the requirement of his counsel's consent." (*Chadd, supra*, 28 Cal.3d at p. 751.)

Defendant urges us to revisit and limit our holding in *Chadd* because unlike the defendant in that case—who sought to waive any defense entirely and confirmed unambiguously that his desire to plead guilty amounted to an attempt to commit suicide with state assistance—defendant in the present case sought to plead guilty in order to help establish a foundation for a "remorse" defense at the penalty phase. But we need not decide in this case

---

Cal.3d at p. 746.) Similarly, because defendant in the present case did not request that counsel be relieved and that she be allowed to represent herself, we need not and do not consider whether section 1018 may be so construed.

whether *Chadd* would apply to a defendant's desire to enter a guilty plea as part of a strategy to obtain a life sentence at the penalty phase, because the record here does not indicate that defendant sought to plead guilty in furtherance of such a strategy. Instead, the record supports an inference that defendant desired to plead guilty in order to avoid testifying against "Beto," whom her counsel sought to implicate as an accomplice in the murder of Autumn Wallace.

 During the ex parte colloquy prior to jury selection, defense counsel informed the court that defendant refused to testify because she was in "absolute fear of her safety and she's in absolute fear of the safety of her family should it become known to Beto that we in some way, shape, or form, for lack of a better term, have given him up." Although defense counsel did not state explicitly that defendant's desire to plead guilty and her refusal to testify were interconnected, the tenor of the lengthy discussion clearly supports that inference. Defendant, who was present at the colloquy, did not dispute counsel's characterization of her position and said nothing more than that she desired to "plead guilty." In particular, she made no overt or implicit reference to remorse or a desire to take responsibility for the crime. Thus, as defense counsel informed the trial court, although defendant told him that "Beto" had pressured her to murder Autumn by threatening defendant's child, she refused to testify to that effect, because she allegedly continued to fear for the safety of herself and her family. In other words, it appears that defense counsel reasonably believed that defendant sought to plead guilty to a capital offense not in order to help establish a foundation for a defense of "remorse" at the penalty phase, but instead to avoid naming an alleged coconspirator and thus protect herself and her family from harm. Defense counsel's refusal to consent to a guilty plea under these circumstances was not unreasonable.

As we recognized in *Chadd*, the 1973 statutory revision adding to section 1018 the requirement of counsel's consent was part of a more extensive revision of California's death penalty legislation and thus was intended to serve as a "further independent safeguard against erroneous imposition of a death sentence." (*Chadd, supra,* 28 Cal.3d at p. 750.) In *Chadd*, we explained that " '[a] plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment.' " (*Chadd, supra,* 28 Cal.3d at p. 748, quoting *Boykin v. Alabama* (1969) 395 U.S. 238, 242 [23 L.Ed.2d 274, 89 S.Ct. 1709].) The consent requirement of section 1018 has its roots in the state's strong interest in reducing the risk of mistaken judgments in capital cases and thereby maintaining the accuracy and fairness of its criminal proceedings. (*Chadd,* at pp. 750, 753.) The statute constitutes legislative recognition of the severe consequences of a guilty plea in a capital case, and provides protection against an ill-advised guilty plea and the erroneous imposition of a death sentence.

Defense counsel's refusal to consent to defendant's guilty plea under the present circumstances was well within the purview of our holding in *Chadd*. Although defendant did not seek to enter a guilty plea in order to effectuate a state-assisted suicide, the record demonstrates that she nonetheless sought to waive her right to present a defense in order to prevent the presentation of evidence regarding an accomplice—evidence that her counsel believed would mitigate her culpability for the murder. Had defense counsel capitulated to defendant's desire to plead guilty unconditionally despite the information she had conveyed to him implicating another person in the murder, defendant's plea would have cast doubt on potentially critical mitigating evidence. A guilty plea entered under such circumstances might very well lead to the erroneous imposition of the death penalty—precisely the outcome section 1018 is intended to prevent.

We likewise reject the claim that counsel's refusal to consent to the guilty plea became unreasonable because defendant's refusal to testify at the guilt phase of her trial hindered counsel's presentation of her defense. Defendant contends that because counsel was well aware she would not testify, and because the defense strategy would be substantially undercut by defendant's silence, counsel should have consented to defendant's entering an unconditional guilty plea. However, in view of the circumstance that the trial court admitted into evidence the videotape of defendant repeatedly confessing to the murder of Autumn Wallace, defense counsel was not unreasonable in attempting to present a defense that would mitigate defendant's culpability in the crime.

■ Defendant faults the trial court for failing to inquire into defendant's reasons for desiring to plead guilty. She claims that had the trial court done so, it would have discovered that defendant sought to take responsibility for the crime in order to demonstrate her remorse, and that defense counsel's refusal to consent was patently unreasonable in light of the weak defense case. Although defendant vigorously argues that the trial court had a duty to intervene after it was apprised of the conflict between defendant and her counsel, there is no express duty on the part of the trial court to ensure that counsel's consent to a guilty plea is not unreasonably withheld. Even assuming the existence of such a duty, the trial court conducted a complete and adequate inquiry into the purported conflict between defendant and her counsel in the present case. The court reasonably relied upon counsel's representation, unrebutted by defendant, that the conflict concerned defendant's desire to plead guilty in order to avoid testifying against "Beto," who might retaliate against her and her family. Although defendant had ample opportunity during the lengthy ex parte discussion between defense counsel and the court to elaborate on her motivation to enter a guilty plea, she told the court only that she wished to "plead guilty." Moreover, as we have held in the context of *Marsden* hearings (*People v. Marsden* (1970) 2 Cal.3d 118 [84

Cal.Rptr. 156, 465 P.2d 44] (*Marsden*)), any conflict over the wisdom of presenting evidence that "Beto" had pressured defendant into participating in the murder was merely a dispute over tactics and would not by itself constitute an " 'irreconcilable conflict.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1190 [17 Cal.Rptr.3d 532, 95 P.3d 811] (*Cole*); *People v. Welch* (1999) 20 Cal.4th 701, 728–729 [85 Cal.Rptr.2d 203, 976 P.2d 754] (*Welch*).) Indeed, as we noted in *Cole*, a " 'defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense.' " (*Cole, supra*, 33 Cal.4th at p. 1192, quoting *Welch*, at p. 728.)

Defendant contends the decision how to plead is "fundamental," and therefore her disagreement with counsel concerned a fundamental aspect of her defense that the trial court should have recognized must remain within defendant's control. As set forth above, however, nothing in the record supports defendant's contention that her desire to plead guilty was motivated by a desire to establish a defense of remorse or to demonstrate her acceptance of responsibility for the murder so that a lesser punishment might be imposed at the penalty phase. Accordingly, the trial court reasonably concluded that the dispute between defendant and her counsel did not implicate a constitutionally protected fundamental interest that might override the plain terms of section 1018.[5]

---

[5] The present case is distinguishable from *In re Alvernaz* (1992) 2 Cal.4th 924 [8 Cal.Rptr.2d 713, 830 P.2d 747] (*Alvernaz*), in which we recognized that a defendant possesses a "constitutionally protected right to participate in the making of certain decisions which are fundamental to his or her defense" and that the decision as to whether to accept or reject a "proffered plea bargain and proceed to trial should not be made by a defendant encumbered 'with a grave misconception as to the very nature of the proceeding and possible consequences.' " (*Id.* at p. 936.)

In *Alvernaz*, the defendant contended that trial counsel erroneously had advised him regarding the length of the sentence that might be imposed should he proceed to trial and be found guilty. He further asserted that had he known of the potential consequences, he would have accepted the plea agreement offered by the prosecution prior to trial. In light of the fundamental nature of the decision to accept or reject an offer to plead guilty in exchange for a lesser sentence, we concluded that the rendering of ineffective assistance by counsel, resulting in a defendant's decision to reject an offered plea agreement and proceed to trial, constitutes a constitutional violation not remedied by a fair trial. (*Alvernaz, supra*, 2 Cal.4th at p. 936.) Thus, a defendant can establish prejudicial error if he or she is able to demonstrate both deficient performance and a reasonable probability that, but for counsel's deficient performance, the defendant would have accepted a proffered plea agreement that, in turn, would have been approved by the trial court. (*Id.* at p. 937.)

In the present case, the prosecution did not offer a plea agreement. Unlike the conditional plea agreement offered and rejected in *Alvernaz*, the prosecution here rejected defense counsel's offer of a plea of guilty in exchange for a sentence of life in prison without possibility of parole. To the extent the prosecution made any "offer," it was merely to suggest that defendant enter an unconditional guilty plea—a plea to which defense counsel would not consent. Even assuming our reasoning in *Alvernaz* applies to the present case, in which defense

Defendant also contends that if the trial court believed defendant's desire to plead guilty was unreasonable, it had a duty to order a competency hearing. There is no indication in the record, however, that the trial court believed defendant's desire to plead guilty was unreasonable. The trial court recognized that defendant sought to plead guilty, that defense counsel would not consent, and that the dispute was one involving tactics, requiring no action on the court's part. Defense counsel did not mention any issue concerning defendant's competency, and explained that defendant's desire to plead guilty was the product of her alleged fear of testifying against "Beto." In addition, defendant did not provide any indication that she was incompetent. The trial court had no duty to inquire further into defendant's competence.

Defendant further faults the trial court for failing to appoint second counsel after defense counsel conveyed the circumstances of the conflict between himself and defendant and suggested that another counsel be appointed to advise defendant. Section 987, subdivision (d) provides in relevant part: "In a capital case, the court may appoint an additional attorney as a cocounsel upon a written request of the first attorney appointed. The request shall be supported by an affidavit of the first attorney setting forth in detail the reasons why a second attorney should be appointed. . . . The court shall appoint a second attorney when it is convinced by the reasons stated in the affidavit that the appointment is necessary to provide the defendant with effective representation." (See also *People v. Keenan* (1982) 31 Cal.3d 424, 430 [180 Cal.Rptr. 489, 640 P.2d 108].)

Defendant concedes that defense counsel did not file a written request for cocounsel as required by section 987, subdivision (d), but asks that we interpret defense counsel's oral suggestion as a formal request for *Keenan* counsel. We decline to do so. The sole allusion to such a request was defense counsel's suggestion that second counsel might be appointed to advise defendant regarding the consequences of her decision not to testify. The trial court was not requested to, and did not, rule on a formal motion to appoint second counsel. Thus, the issue was not preserved for appeal. (Evid. Code, § 353, subd. (a); *People v. Alvarez* (1996) 14 Cal.4th 155, 186 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

In the alternative, defendant asserts that defense counsel rendered ineffective assistance by failing to invoke the trial court's discretion to appoint a second attorney to assist counsel at the guilt and penalty phases of this capital

---

counsel withheld consent to an unconditional plea of guilty in a capital case, as explained above defendant has not established that counsel acted unreasonably in withholding consent, and thus has not demonstrated that counsel's performance fell below an objective standard of reasonableness under the prevailing norms of practice. (*Alvernaz, supra,* 2 Cal.4th at p. 937.)

case. (*People v. Keenan, supra,* 31 Cal.3d at p. 430; § 987, subd. (d).) Defendant asserts that (1) her case was unusually daunting, (2) counsel was overwhelmed and improperly relied on his investigator to perform tasks that should have been performed by an attorney, (3) the lack of cocounsel led to presentation of a deficient and ill-advised defense that relied solely upon a "duress" theory that ultimately was not available to absolve defendant of responsibility for the murder of Autumn Wallace, and (4) counsel was not prepared to offer evidence in mitigation at the penalty phase, which required the development of issues and evidence different from what was presented at the guilt phase.

The record on appeal does not establish that counsel provided constitutionally inadequate assistance in failing to request cocounsel. Nothing in the record demonstrates that Monroe performed below constitutional standards, especially in light of the lack of cooperation he received from defendant. (*People v. Michaels* (2002) 28 Cal.4th 486, 523 [122 Cal.Rptr.2d 285, 49 P.3d 1032] (*Michaels*).) To the contrary, the record reveals that defense counsel sought to present a defense that would minimize defendant's culpability based upon her own description of the events, and that possibly would avoid imposition of the death penalty. The circumstance that defendant refused to assist counsel in presenting that version of the events to the jury, allegedly because she was afraid of the consequences of further identifying the second man, thereby hindering presentation of her defense, does not render unreasonable the refusal of counsel to accede to defendant's desire to plead guilty or counsel's continuing representation inadequate. Moreover, the cooperation between Monroe and his investigator in performing "quasi-legal" tasks such as examining appropriate areas of defense and/or mitigation was not improper and does not demonstrate that Monroe was overwhelmed in conducting the defense.

 In any event, "because the claim is presented as one of ineffective assistance of counsel, relief depends solely on whether counsel's error, if any, may have affected the outcome." (*People v. Webster* (1991) 54 Cal.3d 411, 437 [285 Cal.Rptr. 31, 814 P.2d 1273], citing *Strickland v. Washington* (1984) 466 U.S. 668, 692–693 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*).) The record does not reflect that, but for counsel's refusal to permit defendant to enter an unconditional guilty plea, or his failure to request appointment of second counsel, a more favorable verdict was reasonably probable. (*Michaels, supra,* 28 Cal.4th at p. 525.)

## 2. *Failure to Admit Evidence of Offer to Plead Guilty*

Defendant urges that the trial court erred in ruling inadmissible defendant's offer to plead guilty, thereby depriving her of crucial mitigating evidence and

violating her constitutional right to due process of law.[6] As discussed in detail above, after extensive in camera consultation between defense counsel and the trial court regarding defendant's desire to enter a guilty plea, the trial court concluded no irreconcilable conflict between defendant and her counsel existed, and the case proceeded to trial. The transcript of those in camera proceedings discloses that defense counsel believed that defendant sought to enter an unconditional plea of guilty, and counsel's refusal to grant consent was based upon his concern that defendant would be "pleading guilty for all intents and purposes to a death sentence."

Thereafter, the prosecutor, who was not present at the in camera proceedings, made a pretrial motion to exclude evidence of defense counsel's offer to enter a conditional plea of guilty.[7] The prosecutor contended that although an offer of an unconditional guilty plea would be relevant mitigating evidence, defendant's offer to plead guilty on condition that she receive a sentence of life imprisonment without possibility of parole did not constitute mitigating evidence and should be excluded from consideration by the jury.[8] It is evident from the colloquy between the prosecutor and the trial court that the prosecutor's in limine motion sought solely to exclude evidence of defendant's conditional offer to plead guilty.

In opposing the motion, defense counsel reiterated the offer to enter a conditional guilty plea in order to demonstrate that defendant indeed felt remorse for her commission of the crime. In response, the prosecutor stated that pursuit of the death penalty in this case was nonnegotiable and that only an unconditional plea of guilty would constitute evidence of remorse. The trial court granted the prosecutor's motion and prohibited defense counsel from introducing evidence—at either the guilt phase or the penalty phase—of defendant's conditional offer to plead guilty. The court reasoned that a mere offer to plead guilty, on condition that the prosecutor not seek the death penalty, would not be relevant evidence at the guilt phase and would not be the proper subject of mitigating testimony at the penalty phase. Ultimately, no evidence of defendant's unaccepted conditional offer to plead guilty was presented at either the guilt or the penalty phase of trial.

---

[6] Defendant contends this error prejudiced her in her penalty phase trial. She does not seek a new guilt phase trial.

[7] In arguing in favor of the motion, the prosecution stated there had been a "request by defense to allow his client to plead guilty to life without possibility of parole in lieu of the death penalty. In lieu of us seeking the death penalty."

[8] Specifically, the prosecutor stated: "If the defendant wanted to plead guilty, she can plead guilty right up front, right now. Go right into the penalty phase and show the jury that she pled guilty and that's the mitigation. Not the fact that she extended or her attorney extended some kind of an offer, because the attorney extending some kind of an offer isn't anything."

The Attorney General urges that defendant forfeited her claim because after the court made its ruling, defense counsel did not raise the issue with the court again or attempt at either of the two penalty phase trials to introduce evidence of defendant's conditional offer to plead guilty. "While it may not be necessary to renew an objection already overruled in the same trial [citation], absent a ruling or stipulation that objections and rulings will be deemed renewed and made in a later trial [citation], the failure to object bars consideration of the issue on appeal." (*People v. Clark* (1990) 50 Cal.3d 583, 623–624 [268 Cal.Rptr. 399, 789 P.2d 127].) Defendant's claim of error relates to the exclusion, from her penalty *retrial*, of evidence of her unaccepted conditional offer to plead guilty. Defendant's claim is forfeited, because the prosecutor did not renew his motion to exclude evidence of defendant's unaccepted conditional offer to plead guilty at the penalty retrial, no stipulation was entered into regarding the renewal of objections and rulings at defendant's penalty retrial, and defendant did not herself seek to present evidence of her earlier conditional plea offer in mitigation at her penalty retrial.

Defendant's claim also fails on the merits. The jury at the second penalty phase trial was presented with extensive evidence of defendant's remorse, including her full taped confession, during which she repeatedly expressed remorse for her commission of the crime. The jury also heard the testimony given by defendant at her first penalty trial, in which she read a letter she had written to the victim and her family expressing remorse for committing the murder. Finally, numerous defense witnesses described defendant's sorrow and remorse concerning the murder, and provided multiple accounts of defendant breaking down and crying because of her remorse. The admission of defendant's offer to enter a conditional plea of guilty to demonstrate her remorse and her acceptance of responsibility for the crime would have been cumulative to these accounts. There is no reasonable possibility the outcome would have been different had the trial court admitted evidence of defendant's conditional offer to plead guilty. (*People v. Robinson* (2005) 37 Cal.4th 592, 641–642 [36 Cal.Rptr.3d 760, 124 P.3d 363]; *People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

Although the prosecutor's motion to exclude the offer to enter the guilty plea, and the ensuing discussion between the parties and the trial court at the hearing, focused solely upon defendant's *conditional* offer to plead guilty, defendant now contends that the trial court erred in granting the motion because, as the court was well aware, defendant sought (but was not permitted) to enter an *unconditional* plea of guilty at the February 21, 1992 in camera hearing. Defendant apparently contends the trial court had a duty, on its own motion, specifically to acknowledge and admit evidence of defendant's desire to plead guilty unconditionally, having become aware at the in camera proceedings of that desire. As noted above, defendant's claim of error

relates to exclusion of this evidence at the penalty retrial, but because defendant did not seek admission of such evidence at that trial, defendant's claim is forfeited. To the extent defendant argues the trial court had an independent duty to raise the issue on its own and thereafter offer and admit such evidence at her penalty retrial, defendant does not offer any authority recognizing such a duty, and we decline to impose such an obligation on the trial court.

Defendant contends defense counsel rendered ineffective assistance of counsel in failing to seek admission of evidence of defendant's willingness to plead guilty unconditionally and failing to cite *People v. Williams* (1988) 45 Cal.3d 1268 [248 Cal.Rptr. 834, 756 P.2d 221], to the trial court for the proposition that an offer to plead guilty might be admissible as mitigating evidence in a capital case if tending to demonstrate remorse.[9] As we discussed above, trial counsel presented extensive evidence to the second penalty phase jury relating to defendant's remorse. Accordingly, trial counsel's failure to seek admission of evidence of defendant's desire to plead guilty unconditionally, or to cite authority supporting the admission of such evidence, was harmless because no reasonable probability exists that, but for counsel's failure to seek the admission of such evidence, the result of the proceedings would have been more favorable to defendant. (*People v. Stanley* (2006) 39 Cal.4th 913, 965 [47 Cal.Rptr.3d 420, 140 P.3d 736] (*Stanley*); *Strickland, supra*, 466 U.S. at pp. 688, 694 [104 S.Ct. 2052].)

### 3. *Failure to Close the Trial Proceedings During Defendant's Testimony*

Defendant contends the trial court erroneously denied her request to close the guilt phase proceedings to the public so that she might testify regarding the actions of the second man, "Beto," without fearing for her safety. After the prosecution had rested its case-in-chief, defendant moved to exclude the press and the public from the courtroom while defendant testified, asserting that their presence "during her testimony will be so prejudicial to the defendant that she will be deprived of a fair trial." Defendant's declaration in support of the motion summarized her intended testimony and stated

---

[9] In *Williams*, we recognized that the purpose of section 1192.4, which bars the admission of evidence of a withdrawn plea in any proceeding, is to promote the public interest by encouraging the settlement of criminal cases without the necessity of a trial, and that in furthering this purpose the statute appears to prevent a *prosecutor* from presenting evidence of an offered or withdrawn guilty plea as an admission of guilt. (See *People v. Williams, supra*, 45 Cal.3d at p. 1333, fn. 9; *People v. Wilson* (1963) 60 Cal.2d 139, 155–156 [32 Cal.Rptr. 44, 383 P.2d 452].) Accordingly, we observed in dictum, "[i]t is not clear to us that section 1192.4 would bar a defendant from offering in mitigation his expressed willingness to plead guilty—when that expressed willingness does in fact tend to show remorse, etc." (*Williams, supra*, 45 Cal.3d at p. 1333, fn. 9, italics omitted.)

she feared retaliation from the "other male Hispanic" if she testified in open court. The declaration concluded: "If I testify in public so the newspapers get the information and I identify this male Hispanic, I believe my family will be harmed because the man is still out in the community. [¶] I cannot and will not testify unless my testimony is taken in a closed courtroom with my testimony sealed." Defendant further declared that the second Hispanic man induced her to murder Autumn Wallace by threatening to harm her and her family if she did not "do something about Autumn."

During the colloquy with defense counsel at the hearing, the trial court observed there was no evidence that defendant's mother or children ever had been threatened with harm, or that the unidentified man was "even in the area or counsel would have been able to locate the person." The court further advised that the defense of duress was not available in a capital murder case, that the facts did not support an aider and abettor theory of culpability, and that therefore it was unclear that defendant could present a defense based upon the proposed testimony. The court observed that the clear inference from the declaration was that defendant did, in fact, know the identity of the second man and that therefore her testimony in open court might facilitate his identification and apprehension. The court also explained that closing the courtroom to the public during defendant's testimony might lead the jury to infer that the court attached some credibility to defendant's testimony or "in fact, believed that there was a valid threat to exclude the public during her testimony. And I don't believe any instruction to the contrary would alleviate the possible danger of that interpretation."

Although many of defendant's claims on appeal are founded upon the premise that defense counsel rendered ineffective assistance by presenting a third party culpability defense, she implicitly embraces that same defense in advancing her present claim of error. She contends the trial court's failure to close the trial prevented her from testifying because of her fear for the safety of her family, and was prejudicial because her testimony would have provided evidence in mitigation at the penalty phase.

As we have recognized, the trial court in unusual circumstances may exercise its discretion to close portions of a criminal trial to the public without the consent of the defendant for good cause in order to promote the interests of justice or for the protection of witnesses or parties. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298–1299 [18 Cal.Rptr.2d 796, 850 P.2d 1] (*Cummings*); *People v. Cash* (1959) 52 Cal.2d 841, 846 [345 P.2d 462], citing discussion in *Kirstowsky v. Superior Court* (1956) 143 Cal.App.2d 745 [300 P.2d 163].) The trial court in *Kirstowsky* ordered the courtroom closed during the testimony of the defendant at a murder trial because she intended to testify regarding embarrassing "abnormal sexual practices" that had been

"enforced upon her," and because she was experiencing extreme emotional disturbance and would be unable to testify on her own behalf unless she could do so in a courtroom closed to the public and the press. (*Kirstowsky, supra,* 143 Cal.App.2d at p. 748.) The trial court below distinguished *Kirstowsky,* because the present case did not involve any abnormal practices, sexual or otherwise, and there was "no evidence that our accused is in the condition of extreme emotional disturbance and bewilderment at the prospect of testifying."[10]

██ A court may restrict attendance by members of the public only if restriction is necessary to preserve a defendant's right to a fair trial. (*Cummings, supra,* 4 Cal.4th at p. 1299.) In the present case, we find no error, because defendant has not established she was denied the right to a fair trial by the court's ruling. (*Id.* at pp. 1298–1299.) Defendant was aware of her right to testify and willingly chose not to exercise that right. She admitted that she had not been threatened to refrain from testifying, and that the only actual "threats" were those allegedly made by the unidentified man on the day of the murder and several days thereafter, a time (as the trial court noted) one and a half years earlier.

In any event, defendant did not suffer any prejudice from the denial of her motion. She testified during her first penalty phase trial. When the subject of the second man's identity was raised during defendant's cross-examination, defendant refused to answer, stating she was "scared" to identify him. As the Attorney General points out, defendant could have taken a similar course of action during the presentation of testimony at the guilt phase portion of her trial. Finally, in view of the admission in evidence of defendant's lengthy and detailed videotaped confession, it is not reasonably probable that her testimony regarding the involvement of the second man in the murder would have changed the outcome of the guilt phase. Defendant contends her testimony would have provided mitigating evidence at the second penalty phase trial. But her testimony at the first penalty phase trial was read to the jury at the penalty phase retrial, and therefore any error in denying the motion to exclude the public from the trial during the guilt phase would have been harmless.

---

[10] The court also emphasized the presumption that a trial should remain open to the public as discussed in our decision in *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519 [165 Cal.Rptr. 851, 612 P.2d 941], in which we held that the trial court erred in granting a prosecution request to close a pretrial hearing over the defendant's objection, because of a defendant's paramount right to an open and public trial. (See also *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1197–1207 [86 Cal.Rptr.2d 778, 980 P.2d 337], and cases cited therein.)

### B. *Voir Dire Relating to the Guilt and Penalty Phases of Trial*

#### 1. *Restriction Regarding the Age of the Victim*

Defendant contends the trial court committed numerous errors in conducting voir dire during the guilt phase of the trial and the penalty phase retrial. For the reasons that follow, we find no error.

Defendant asserts the trial court erred in denying defense counsel's request for additional voir dire, at both the guilt phase and second penalty phase, regarding the victim's age. With respect to the guilt phase, defense counsel proposed a juror questionnaire that included the questions: (1) "It is expected that you will hear testimony regarding the multiple stabbing death of a eight-year-old girl.[11] Do you expect that such testimony would so upset you that you could not honestly be fair and impartial?" and (2) "If such evidence is introduced and proved to your individual satisfaction beyond a reasonable doubt, do you believe that would prompt you to automatically urge the death penalty regardless of any potential mitigating factors?" In a second proposed juror questionnaire, defense counsel proffered the following question: "Please explain if the fact that the victim in this case is an eight-year-old little girl would prohibit you from being a fair and impartial juror in this case?"[12]

The court denied each party's request for a written juror questionnaire and declined to permit the defense's proposed questions during the voir dire on the ground they improperly would ask that the prospective jurors prejudge the evidence in the case. Thereafter, the court denied defense counsel's request to conduct direct voir dire of the jurors as well as followup voir dire. Ultimately, the trial court conducted the entire voir dire and did not permit defendant or the prosecutor to question the jurors directly.

At the penalty retrial, defense counsel repeated his request for additional voir dire to ascertain whether prospective jurors would harbor a bias against defendant because the victim was a child. At that trial, both the prosecutor and defense counsel were allowed to conduct direct voir dire, and defense counsel questioned certain jurors regarding any bias they would have because the victim was a child.

Defendant contends the trial court committed prejudicial error both at the initial trial and the penalty retrial by denying defendant's request for additional voir dire focusing upon the victim's age and inquiring concerning the

---

[11] Although the victim, Autumn Wallace, was nine years of age when she was murdered, defense counsel mistakenly stated her age as eight years in the proposed questionnaires and during his voir dire questioning of some prospective jurors.

[12] The prosecution's proposed questionnaire included questions regarding the prospective jurors' health, personality traits, and attitudes toward the death penalty, including a series of proposed questions pertaining to any "conscientious" objections to the death penalty.

effect, if any, of the victim's age upon the prospective jurors' ability to remain fair and impartial. As a threshold matter, because error occurring in the death qualification of the jury at most may be prejudicial only as to the penalty phase, any error in the death qualification of the first jury is irrelevant because that jury decided only defendant's guilt. Accordingly, even if the trial court erred in conducting voir dire of the first jury, such error did not affect the penalty verdict and was harmless.

Defendant contends the circumstance that at the penalty retrial certain prospective jurors were excused for cause on the basis of bias triggered by the victim's age establishes that the first jury, which was not questioned so extensively, was prejudicially biased. She speculates that had the trial court permitted more extensive questioning of the initial jury regarding the circumstance that the victim was a child, that jury would not have acted out of bias and would have returned a verdict of life without possibility of parole, thereby eliminating the need for a penalty retrial. This theory is pure speculation and finds no support in the record. Accordingly, even if the trial court erred in conducting voir dire of the first jury, any such error did not affect the penalty verdict and was harmless.

With regard to the second penalty phase jury, defendant concedes the trial court allowed defense counsel to question prospective jurors at the penalty retrial regarding the victim's age, and that such questioning revealed a bias in favor of the death penalty on the part of some prospective jurors who then were excused for cause. Although the trial court rejected defendant's specific questions concerning whether the victim's age would impair the prospective jurors' ability to remain fair and impartial,[13] it nonetheless permitted extensive questioning on this subject.

Notably, the court agreed with defense counsel that the victim's age might affect the prospective jurors' views. Indeed, the prosecution posed no objection to asking prospective jurors whether "they would be biased to the point they could not be fair and impartial if the victim is a nine-year-old child." Accordingly, the court agreed to inform the prospective jurors at the outset that defendant had been found guilty of killing a nine-year-old child, and that the victim died of multiple stab wounds. When appropriate, the court also reiterated the circumstances of the crime during questioning of individual prospective jurors.

---

[13] The proposed question read: "Who, if any of you, believe that you could not feel any sympathy or compassion for someone such as the defendant who has committed this kind of crime?" During the course of discussion, defense counsel proposed a modified question "to the effect, who, if any of you, believe that you could not feel any sympathy or compassion for someone such as the defendant who has been convicted of killing a nine-year-old child or nine-year-old girl?"

Thereafter, during the course of extensive questioning of each prospective juror conducted in open court in the presence of all the prospective jurors, numerous prospective jurors conceded that the circumstance the victim was a child might affect his or her ability to be fair and impartial. Those jurors thereafter were excused for cause.[14] Additionally, defense counsel was permitted to question prospective jurors regarding the circumstance that the victim was a child even when the prospective juror had not declared that such information might lead to bias.[15]

In sum, although the trial court declined to inquire specifically of each prospective juror concerning the impact, on his or her ability to remain impartial, of the circumstance that the victim in this case was a child, the record reveals that the issue was discussed exhaustively throughout the voir dire conducted at the penalty retrial. All of the prospective jurors repeatedly were made aware of the unusual circumstances of this case, and numerous prospective jurors revealed that the victim's young age would prevent their serving as fair and impartial jurors. Numerous other prospective jurors candidly told the court that this circumstance would weigh heavily on them, but maintained they nonetheless could retain an open mind, and defense counsel was permitted to fully examine each of those jurors regarding the sincerity of those stated beliefs. In light of the exhaustive examination of the

---

[14] For example, in response to the court's question whether pretrial publicity "would affect your ability to be a completely fair and impartial juror in the case," Prospective Juror T.D. answered, "possibly, because a child died . . . with a child dying, I think it should be a death penalty." The trial court excused Prospective Juror T.D. for cause. Similarly, Prospective Juror N.J. told the court that the circumstance that the victim was a child caused him to conclude that regardless of the evidence presented, the death penalty should be "automatic" in this case. The trial court dismissed Prospective Juror N.J. for cause. Prospective Juror R.R. also told the court that after learning that the victim in this case was a child, she had concluded that death was the only appropriate punishment and she would be unable to remain impartial. Prospective Juror R.R. was excused for cause. Although Prospective Juror M.O. did not specifically mention that the victim's age played a role, she told the court that learning of the circumstances of the crime had caused her to form a fixed opinion regarding death as the appropriate punishment. The court excused her for cause. Prospective Juror E.A. told the court "it would be awfully hard" to maintain an open mind "when there is a nine year old involved" and was similarly excused for cause. Prospective Juror C.F., who stated that "the fact that there is a child involved" would preclude her being a fair and impartial juror, also was excused for cause.

[15] In questioning Prospective Juror A.N., defense counsel noted that "you heard a little bit about the fact that it was a stabbing death of a little nine-year-old girl" and inquired whether such information would cause the juror to have a closed mind. In questioning Prospective Juror R.T., defense counsel asked: "[Y]ou heard a little bit about the circumstances of the crime and you have a couple of youngsters who are eight years old. Do you think that will just close down your mind?" Prospective Juror R.T. replied that "it will be hard but I think I could [keep an open mind]."

issue during the penalty retrial, we discern no prejudicial error in the trial court's rejection of defendant's specific proposed question regarding the victim's age.

### 2. *Failure to Excuse Prospective Juror A.P. for Cause*

■ Defendant contends that the trial court erred in declining to excuse Prospective Juror A.P. for cause during the initial voir dire after A.P., during a private conference in chambers, informed the court that a preteen friend of his granddaughters' had been raped and murdered shortly after leaving their home, that the girls had been subjected to participation in trial proceedings for several years in that case, and that, as a result, the subject of the present case was "emotional" for him. In a capital case, a juror is properly excused for cause if that juror would "automatically" vote for a certain penalty or if the juror's views on capital punishment would " ' "prevent or substantially impair" ' " the performance of his or her duties in keeping with the juror's oath and the court's instructions. (*People v. Stitely* (2005) 35 Cal.4th 514, 538 [26 Cal.Rptr.3d 1, 108 P.3d 182] (*Stitely*), quoting *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 88 S.Ct. 1770], and *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].)

In the present case, the trial court asked A.P. whether his emotions would influence his fairness in this case, to which A.P. responded: "I don't think it would have any impact on the case. I think I could act fair in this trial." In response to a followup question from the court, A.P. stated that the circumstance that the victim in the present case was a young girl would not bias his judgment. After voir dire resumed, in response to a question whether he would have a strong emotional reaction to videotaped evidence of the crime scene and of the victim's body, A.P. stated he believed he could examine such evidence without having a strong emotional reaction to it. The court thereafter denied defense counsel's motion to challenge Prospective Juror A.P. for cause, and counsel used his last peremptory challenge to strike this prospective juror.

Defendant asserts that the trial court erred in denying defendant's motion to excuse this prospective juror for cause, and in denying defendant's request for additional peremptory challenges. Defendant further contends that because the trial court failed to conduct adequate questioning of all prospective jurors, it is difficult to discern how many other prospective jurors should have been excused for cause. Defendant notes that she exercised peremptory challenges to remove Prospective Jurors V.E., T.B., S.S., and G.L. after each individual expressed some hesitation concerning his or her impartiality in a child-victim murder case. Defendant speculates that further questioning

would have revealed grounds for challenging each of these excused prospective jurors, as well as Prospective Juror A.P., for cause. Defendant urges that she was deprived of her constitutional right to a fair and impartial jury, because she was obliged to use, at a minimum, five peremptory challenges to remove prospective jurors who should have been removed for cause, and that the court's refusal to sustain defendant's challenge to Prospective Juror A.P. for cause resulted in the denial of defendant's Fifth, Sixth, Eighth, and Fourteenth Amendment rights to a fair and impartial jury.

A defendant who claims a trial court wrongly denied a challenge for cause must demonstrate that his or her right to a fair and impartial jury thereby was affected, by establishing that he or she (1) was deprived of a peremptory challenge that he or she would have employed to excuse a juror who sat on the case, (2) exhausted all available peremptory challenges, and (3) expressed to the court dissatisfaction with the jury selected. (*People v. Crittenden* (1994) 9 Cal.4th 83, 121–122 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Hawkins* (1995) 10 Cal.4th 920, 939 [42 Cal.Rptr.2d 636, 897 P.2d 574]; *People v. Horton* (1995) 11 Cal.4th 1068, 1093 [47 Cal.Rptr.2d 516, 906 P.2d 478].) Defendant has not identified any person who sat on her jury panel whom she would have peremptorily challenged but for the circumstance that she had used her final challenge to excuse another prospective juror. Accordingly there was no error in failing to excuse A.P. for cause. Moreover, any error in failing to excuse A.P. for cause would not have been prejudicial, because there is no basis for us to conclude that the jury empanelled was anything but impartial. (*Ross v. Oklahoma* (1988) 487 U.S. 81, 86–91 [101 L.Ed.2d 80, 108 S.Ct. 2273]; *People v. Yeoman* (2003) 31 Cal.4th 93 [114 Cal.Rptr.3d 186, 72 P.3d 1166] (*Yeoman*).) Finally, defendant's claims that Prospective Jurors V.E., T.B., S.S., and G.L. should have been excused for cause are purely speculative, and there is no support in the record for defendant's claim that further questioning would have revealed a basis for removing any of those jurors for cause.

Defendant claims the trial court erred in failing to grant her request for additional peremptory challenges. The court was not required to grant such a request absent a likelihood that defendant otherwise would receive an unfair trial before a partial jury (*People v. Pride* (1992) 3 Cal.4th 195, 230 [10 Cal.Rptr.2d 636, 833 P.2d 643]), a standard not met in the present case. As noted above, defendant has not demonstrated that the trial court erroneously denied any challenge for cause, and no basis for reversal has been shown. (*Ibid.*)

### 3. *Denial of Request for Sequestered Voir Dire*

Defendant contends that the trial court erred in failing to conduct individual death-penalty-qualification voir dire at both the guilt phase and the

second penalty phase trial. In *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301] (*Hovey*), we stated that in order to minimize the potentially prejudicial effects of voir dire conducted in open court, in future capital cases the portion of the voir dire of each prospective juror involving death qualification should be conducted individually and in sequestration. Our holding in *Hovey* has been abrogated by Code of Civil Procedure section 223, as added in 1990 by Proposition 115. (*People v. Vieira* (2005) 35 Cal.4th 264, 288 [25 Cal.Rptr.3d 337, 106 P.3d 990] (*Vieira*).) That statute provides, in pertinent part: "Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases." (Code Civ. Proc., § 223.) Because defendant's trial was held after section 223 of the Code of Civil Procedure was enacted, that statute governs here.

Notwithstanding Code of Civil Procedure section 223, defendant contends the trial court's failure to conduct individual voir dire as enunciated in *Hovey* violated her federal constitutional rights. We disagree. The rule in *Hovey* was not constitutionally compelled. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1135 [240 Cal.Rptr. 585, 742 P.2d 1306]; accord, *Vieira, supra*, 35 Cal.4th at p. 287.) This statute was intended to overrule the conclusion in *Hovey* that individual sequestered voir dire is required during death penalty qualification (*Vieira, supra*, 35 Cal.4th at p. 288; *People v. Waidla* (2000) 22 Cal.4th 690, 713–714 [94 Cal.Rptr.2d 396, 996 P.2d 46]), and defendant does not cite any authority in support of her argument that individual sequestered voir dire is constitutionally compelled.

Defendant asserts the trial court mistakenly determined it lacked discretion to conduct *Hovey* voir dire following the passage of Proposition 115. This contention clearly is belied by the record. In denying without prejudice defendant's request for sequestered voir dire, the trial court observed: "[O]ne of the principal reasons Proposition 115 passed was to eliminate—the court overruled the requirements of the *Hovey* case. *I recognize the court would have discretion to have individual voir dire,* but counsel hasn't pointed out on the *Witherspoon* type of voir dire any unique aspect of the case . . . that would separate this case from any other special circumstances case insofar as individual voir dire on death penalty qualification . . . . In your response you indicate that even though Prop. 115 might have overruled *Hovey*, the court still has discretion to allow it if there was some unique fact of this case that would separate it just from the ordinary, if there is such a thing, capital case . . . . I'm not inclined, unless there is some unusual circumstances, to allow *Hovey* voir dire." Although the trial court subsequently stated that *Hovey* voir dire is "not permissible" under Proposition 115, the court's earlier remarks reveal that it understood that it retained discretion to allow sequestered voir dire in an appropriate case.

 In the alternative, defendant contends the trial court abused its discretion in the manner in which it conducted group death-penalty-qualification voir dire of the prospective jurors. We disagree. A trial court has broad discretion over the number and nature of voir dire questions concerning the death penalty. (*Stitely, supra,* 35 Cal.4th at p. 540.) Defendant contends that at both trials the court's voir dire impermissibly was slanted toward a death-oriented jury because of a series of questions regarding the circumstances under which prospective jurors might be unwilling to impose the death penalty. As we previously have recognized, a trial court should be evenhanded in questioning prospective jurors during death-penalty qualification and should inquire into the jurors' attitudes both in favor of and against the death penalty. (*People v. Champion* (1995) 9 Cal.4th 879, 908–909 [39 Cal.Rptr.2d 547, 891 P.2d 93].) Nonetheless, when the trial court asks jurors only whether their views on the death penalty would prevent their imposing a sentence of death, such questioning does not predispose the jury in favor of imposing the death penalty. (*Ibid.*) Indeed, we repeatedly have held that questions designed to ensure that a jury is death-penalty qualified do not result in a jury that is death-penalty oriented. (*People v. Pinholster* (1992) 1 Cal.4th 865, 913 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People v. Clark, supra,* 50 Cal.3d at p. 597; *People v. Stankewitz* (1990) 51 Cal.3d 72, 104 [270 Cal.Rptr. 817, 793 P.2d 23].)[16]

Defendant has not established that the trial court's questioning impermissibly prejudiced the jury at either trial or that the court abused its discretion in conducting group voir dire. The court clearly recognized its obligation to comply with section 223 of the Code of Civil Procedure. Defendant fails to convince us that the voir dire procedure followed by the trial court either at the guilt phase or the penalty phase retrial constituted an abuse of discretion or violated any provision of the federal Constitution. (*People v. Avila* (2006) 38 Cal.4th 491 [43 Cal.Rptr.3d 1, 133 P.3d 1076].)

### 4. *Alleged Cumulative Errors During Jury Voir Dire*

Finally, defendant asserts that the trial court's individual and cumulative errors in conducting the voir dire compromised her right to a fair and impartial jury. Because we have found no error in the voir dire procedures employed by the court at the trial of either the guilt phase or the second penalty phase, defendant's claim of cumulative error is without merit.

---

[16] At the penalty phase retrial, although the court denied defense requests to conduct the entire death-penalty qualification voir dire individually, it nonetheless permitted sequestered voir dire of some of the jurors because of information they possessed concerning the case, or for some other reason.

### C. *Penalty Phase Issues*

#### 1. *Failure to Substitute Counsel*

Defendant contends the trial court violated her Sixth Amendment right to counsel by denying her request for substitute counsel after her first penalty phase trial ended in a mistrial. Defendant urges that the initial breakdown in the attorney-client relationship when defense counsel refused to consent to defendant's entry of a guilty plea was exacerbated by counsel's insistence on presenting what defendant terms a "some-other-dude-did-it defense" despite defendant's refusal to testify and the absence of any independent evidence to corroborate that theory of the crime. Defendant asserts the ongoing conflict culminated in a complete breakdown in the attorney-client relationship after defendant testified at the first penalty trial, allegedly while under the impression that she was not subject to cross-examination with regard to the circumstances of the crime.

On direct examination during her first penalty phase trial, defendant testified concerning her background and upbringing. At defense counsel's request, she also read a letter she had written to Autumn Wallace, stating in part: "Autumn, if you could hear me, please don't turn away 'cause I want you to know that I'm sorry we took your innocent life." Thereafter, the prosecutor began to cross-examine defendant about the circumstances of the crime, over defense counsel's repeated objection. The trial court ruled that the defense had opened the door to cross-examination concerning the details of the crime. A week later, the first penalty phase jury informed the trial court that it was unable to reach a verdict, and a mistrial was declared. The following day, defendant requested that the trial court appoint substitute counsel.

At the subsequent hearing held pursuant to *Marsden, supra,* 2 Cal.3d 118, defendant stated to the trial court that her attorney had "misrepresented" to her the scope of cross-examination, and that her attorney wanted "to do things I never wanted to do. He still goes ahead and does them." She told the trial court that her "main complaint" was that her attorney had informed her she would not be cross-examined regarding the circumstances of the crime, "and I kept asking him, 'is the D.A. going to ask me that? Is he going to bring that up?' and he told me he wasn't going to. And that's why I went up there on the stand. But 'cause he told me the D.A. wasn't going to ask me anything." Defendant also described the larger, central dispute between herself and her attorney—his insistence on pursuing and presenting a defense that implicated the "other person" and her persistent refusal to name or implicate another person in Autumn Wallace's murder. Defendant complained, among other things, of her attorney's decision to call as a witness at

the second penalty phase trial Dr. Edwards, a move opposed by defendant because she understood that Dr. Edwards planned to testify regarding defendant's relationship with "Beto," while defendant was steadfast in her intention to avoid any mention of "Beto" either as her crime partner or as the man who had raped her as a child. In turn, Defense Counsel Monroe informed the trial court that defendant felt counsel had "betrayed" her, and that as a result, defendant refused to cooperate with him with respect to the pending retrial of the penalty phase.

The trial court conducted a diligent and in-depth inquiry into the subject of the discussion that had taken place between defendant and her counsel prior to defendant's taking the stand, specifically focusing upon what counsel had told defendant regarding cross-examination and repeatedly questioning Attorney Monroe with regard to whether he actually told defendant she would not face cross-examination if she testified. Counsel acknowledged that defendant's recollection or perception of what counsel had told her was different from his own, but stated that although his memory was imprecise, "I did not say to her unequivocally that I would keep [the prosecutor's] cross-examination out. I said I would object to it in the event—not in the event, when he did attempt to get into it."

Defense counsel also told the trial court that counsel had attempted to avoid questioning defendant regarding the circumstances of the crime, but acknowledged having asked defendant to make a statement of remorse to Linda Wallace which subsequently was determined by the trial court to have opened the door to the prosecutor's cross-examination. Defense counsel acknowledged having reviewed defendant's letters to Autumn and Linda Wallace, repeatedly having discussed with defendant the importance of her testimony, and having told her that, should the prosecutor seek to cross-examine her, counsel would object. "How Rosie perceived that, I can't say; or how she interpreted it, I can't say."

The trial court stated with regard to the comment defendant directed to Autumn Wallace, "I'm sorry *we* took your innocent life," that in its view "under any reasonable interpretation of evidence that anybody is going to be able to cross-examine about what she meant by that. So I'm puzzled as to what kind of advice you gave her about that." Defense counsel admitted he had not provided any advice as to the significance of the comment insofar as it might determine the scope of the prosecution's cross-examination. Defense counsel denied, however, having advised defendant that she would not be cross-examined, and reiterated he had informed defendant he would object in the event the prosecutor attempted to cross-examine her regarding the circumstances of the crime. Defense counsel also agreed with the trial court's statement that after the jury had seen defendant's videotaped confession, "if [defendant] didn't testify, she didn't have much of a chance to save her life."

Counsel expressed frustration at defendant's continued refusal to cooperate, especially her refusal to identify the second man. Counsel noted that "Rosie sent us on any number of wild-goose chases before we finally nailed this Beto character down." In particular, counsel expressed concern that "if [defendant] is going to refuse to see me in the jail or cooperate with me, do I end up with a conflict so I can't do the damn job for her?" Thus, counsel, although denying that he had performed incompetently, himself was concerned that defendant's stated refusal to cooperate would compromise his continuing efforts to provide a defense.

The trial court observed that the "alleged betrayal" with respect to the possible scope of cross-examination was not raised by defendant on the day she testified. When questioned about the delay, defendant told the trial court: "I didn't really know what I was supposed to do to bring it up. I had to ask one of the girls in the jail and they kind of told me what—that I could talk and say anything I want whenever I wanted [to] . . . so I didn't know I could have brought it up at that point. I didn't know that at the time."

Ultimately, the trial court found that defendant's request for substitute counsel was untimely, having been made on the morning of the day the court had scheduled a hearing to set a date for retrial. Substantively, the court found that although defense counsel did not specifically tell defendant she would not be subject to cross-examination, she misunderstood his explanation regarding the scope of cross-examination and was under the impression she could read a letter to Autumn without being cross-examined regarding the circumstances of the crime. The court also explained that even if defendant did not understand the nature of cross-examination before her trial began, she should have acquired an understanding, after observing the direct testimony and cross-examination of numerous witnesses, that her statement in the letter—declaring that she was "sorry we took your innocent life"—would subject her to cross-examination regarding the circumstances of the victim's death.

The trial court also found that counsel had not committed any misconduct, and had not demonstrated incompetence, by aggressively pursuing a defense theory that minimized defendant's role in the murder. The trial court noted that if another attorney were appointed to replace Monroe, such an attorney invariably would pursue the same defense strategy because, in light of defendant's videotaped confession, a defense that would attempt to lessen defendant's culpability for the murder of Autumn Wallace by placing shared responsibility for the crime on the second man would provide significant mitigating evidence.

The trial court explained in sum that although defendant and her counsel consistently disagreed regarding tactics, and defendant threatened to withhold

all cooperation from defense counsel, there had been no showing that counsel's continued representation of defendant at the second penalty trial would substantially impair or deny defendant's fundamental rights. As a result, the trial court stated, defendant's refusal to cooperate with her counsel during the penalty phase retrial would be at her own "peril."

■ We find no error in the trial court's ruling. As we have stated, "a *Marsden* hearing is not a full-blown adversarial proceeding, but an informal hearing in which the court ascertains the nature of the defendant's allegations regarding the defects in counsel's representation and decides whether the allegations have sufficient substance to warrant counsel's replacement." (*People v. Hines* (1997) 15 Cal.4th 997, 1025 [64 Cal.Rptr.2d 594, 938 P.2d 388].) The trial court afforded defendant ample opportunity to set forth her complaints regarding counsel's representation, and after hearing defendant's complaints the trial court allowed counsel to respond. The trial court was not required to do more.

Defendant complained primarily of defense counsel's (1) insistence on pursuing a defense that would attempt to temper defendant's culpability for the murder of Autumn Wallace by placing shared responsibility for the crime on the second man, "Beto," and (2) defense counsel's allegedly inaccurate advice regarding the scope of the cross-examination to which defendant would be subjected. The complaints regarding Monroe's defense strategy were essentially tactical disagreements, which do not by themselves constitute an " 'irreconcilable conflict.' " (*Cole, supra*, 33 Cal.4th at p. 1190; see *Welch, supra*, 20 Cal.4th at pp. 728–729.) As noted above with regard to the alleged conflict between defendant and counsel regarding entry of a guilty plea, a disagreement of this nature, by itself, is insufficient to compel discharge of appointed counsel. (See *People v. Smith* (2003) 30 Cal.4th 581, 606 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

"When a defendant chooses to be represented by professional counsel, that counsel is 'captain of the ship' and can make all but a few fundamental decisions for the defendant." (*People v. Carpenter* (1997) 15 Cal.4th 312, 376 [63 Cal.Rptr.2d 1, 935 P.2d 708].) The record does not establish that Attorney Monroe was incompetent or that he would not provide adequate representation during the forthcoming retrial, assuming he received defendant's cooperation. (*Cole, supra*, 33 Cal.4th at p. 1190, citing *Michaels, supra*, 28 Cal.4th at p. 523.) To the contrary, the record reveals that defense counsel vigorously and conscientiously pursued a defense designed to temper defendant's culpability, based upon the version of events conveyed by defendant both to counsel and to the expert witness Dr. Edwards. The circumstance that defendant refused to assist counsel in presenting that version of events to the jury, assertedly because she feared the consequences of her identification of

the second man, does not suggest that counsel rendered ineffective assistance. Although defendant's apparent feeling of "betrayal" regarding her cross-examination may have strained the relationship between defendant and her counsel, the trial court properly found that defendant misunderstood her attorney's advice, and this misunderstanding, although unfortunate, did not justify defense counsel's discharge.

## 2. *Denial of Motion for Change of Venue for Penalty Retrial*

Defendant contends the jurors who sat on the penalty phase retrial were exposed to extensive inflammatory pretrial publicity. The trial court denied defendant's request for a change of venue, concluding the publicity was unlikely to have an impact on defendant's ability to select a fair and impartial jury. Defendant contends the trial court's denial of her request violated her Fifth and Fourteenth Amendment rights to a fair trial and due process of law, her Sixth Amendment right to a fair and impartial jury, and her Eighth Amendment right to a reliable, rational, and accurate determination of the appropriate punishment. We disagree.

" 'A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. "Whether raised on petition for writ of mandate or on appeal from a judgment of conviction, 'the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable.' " [Citation.] "The de novo standard of review applies to our consideration of the five relevant factors: (1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim." [Citation.]' " (*People v. Panah* (2005) 35 Cal.4th 395, 447 [25 Cal.Rptr.3d 672, 107 P.3d 790] (*Panah*), quoting *People v. Sully* (1991) 53 Cal.3d 1195, 1236–1237 [283 Cal.Rptr. 144, 812 P.2d 163].)[17]

Defendant cites numerous newspaper articles published after her arrest and during the course of her trial, following conviction, and after the first penalty phase ending in a mistrial. The news articles reported that defendant had confessed to killing the victim in order to "keep from being caught" for stealing items from the house and that she had been "wired" on drugs during

---

[17] In evaluating the propriety of the trial court's denial of the requested change of venue, we consider the timing of defendant's motion, which was made before the penalty phase retrial, after a prior jury had determined defendant's guilt and made special circumstance findings. As the trial court properly recognized, the guilt and special circumstance issues were not before the penalty jury, and the sole consideration before the trial court was whether the publicity preceding the penalty retrial had predisposed potential jurors toward choosing a death sentence over a sentence of life imprisonment without possibility of parole.

the crime. In one news article, defendant was described as a drug-addicted prostitute who resided in Anaheim's Hispanic "barrio," and the victim as a "popular" White "student," nine years of age, who was at home wearing a pink polka-dot dress and cutting out paper dolls when defendant stabbed her 57 times. Several news articles contained statements by the victim's mother indicating that she was not convinced by defendant's expression of remorse, supported imposition of the death penalty because defendant "deserved to die," and hoped the second penalty phase jury was "not so indecisive."

As a threshold matter, defendant's claims are undermined by her failure to exercise all of her available peremptory challenges. "In the absence of some explanation for counsel's failure to utilize his remaining peremptory challenges, or any objection to the jury as finally composed, we conclude that counsel's inaction signifies his recognition that the jury as selected was fair and impartial." (*People v. Daniels* (1991) 52 Cal.3d 815, 854 [277 Cal.Rptr. 122, 802 P.2d 906] (*Daniels*).)

Defendant's claim also fails on the merits. The first factor we consider in determining whether error occurred in the trial court's denial of a motion for change of venue, the nature and gravity of the offense, might weigh in favor of granting the motion. This factor alone is not dispositive, however. (*Panah, supra,* 35 Cal.4th at p. 449; *People v. Weaver* (2001) 26 Cal.4th 876, 905 [111 Cal.Rptr.2d 2, 29 P.3d 103] (*Weaver*).) With regard to the second factor, the pretrial publicity in this case was neither extensive nor prejudicial. In her motion, defendant cited 20 newspaper articles concerning her case that appeared between July 1990 and April 1992. Twenty articles during a 22-month period cannot be considered "extensive" coverage. (*Panah, supra,* at p. 448 [18 articles over 12-month period not "extensive"].) Nor were the articles particularly prejudicial. Certain of the articles were news stories that variously reported the circumstances of defendant's arrest and the victim's death, and others reported developments as the case proceeded through the guilt phase and the first penalty trial. Although the articles recounted the disturbing circumstances of the crime and described the victim's mother's grief and desire that the defendant receive the death penalty, the coverage was not biased or inflammatory. (*Ibid.* [articles describing the circumstances of the child's murder and grief of the victim's family were not biased or inflammatory].) Moreover, defendant's trial did not commence until February of 1992, more than 18 months after publication of many of the articles. Any potential prejudice arising from those articles was attenuated by the passage of time. (*Welch, supra,* 20 Cal.4th at p. 744.) The two articles that were published, respectively, six and four weeks prior to trial, quoting the victim's mother as supporting imposition of the death penalty, were neither biased nor inflammatory.

Moreover, "the fact that prospective jurors may have been exposed to pretrial publicity about the case does not necessarily require a change of venue." (*Panah, supra,* 35 Cal.4th at p. 448.) " ' "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." ' " (*Ibid.,* quoting *Chadd, supra,* 28 Cal.3d at p. 750.) All of the jurors and alternates who had prior knowledge of the case stated they were capable of setting aside that knowledge and deciding the case based on the law and the evidence presented at trial.

None of the remaining relevant factors support a change of venue in the present case. Defendant's trial was held in Orange County, which, as we previously have observed, is one of the largest counties in population not only in the State of California, but in the entire United States. (*People v. Edwards* (1991) 54 Cal.3d 787, 807 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People v. Douglas* (1990) 50 Cal.3d 468, 495 [268 Cal.Rptr. 126, 788 P.2d 640].) Accordingly, the size of the community does not support a change of venue. (*People v. Staten* (2000) 24 Cal.4th 434, 449 [101 Cal.Rptr.2d 213, 11 P.3d 968].) Moreover, neither defendant nor the victim occupied positions of prominence and popularity. Autumn Wallace became known following her murder, but otherwise was not prominent as an individual or as a member of a well-known family. (*Panah, supra,* 35 Cal.4th at p. 449; *Daniels, supra,* 52 Cal.3d at p. 852.) Although the articles describe Autumn as "popular" and "well-liked," these assessments were made by the limited audience of her grade school peers and her teachers at the school she attended. Moreover, nothing in the record suggests that Linda Wallace's status as an employee of the Orange County Superior Court had any effect on members of the jury pool. (*Panah, supra,* 35 Cal.4th at p. 449; *Weaver, supra,* 26 Cal.4th at p. 906.) Although defendant urges that the pretrial publicity emphasized her status as a Hispanic, drug-addicted prostitute who had failed to integrate into Anaheim's middle class, " 'there was no evidence of unusual local hostility to such persons, such that a change of venue would likely produce a less biased panel. Nor was the pretrial publicity calculated to excite local prejudices in this regard.' " (*Panah, supra,* at p. 449, quoting *People v. Balderas* (1985) 41 Cal.3d 144, 179 [222 Cal.Rptr. 184, 711 P.2d 480]; cf. *People v. Williams* (1989) 48 Cal.3d 1112, 1129 [259 Cal.Rptr. 473, 774 P.2d 146] [pretrial publicity focused on the defendant's race and status as an outsider to the community, in contrast with the victim's ties to the community].)

### 3. *The Prosecution's Examination of Defense Expert Witnesses*

Defendant contends the trial court committed reversible error by permitting the prosecutor to cross-examine two defense expert witnesses based on the rough notes and data prepared by a third expert, and by allowing the prosecutor to call that third expert, a defense consulting psychologist, to testify as a "rebuttal" witness. We find no error.

At the penalty phase retrial, defense counsel called expert witnesses Dr. Armando Morales and Dr. Consuelo Edwards, who testified regarding defendant's sociological and psychiatric condition at the time of the offenses and at the time of trial. Both experts testified that they had been provided raw data and rough notes prepared by Psychologist Martha Rogers, reflecting her administration of the Minnesota Multiphasic Personality Inventory (MMPI) to defendant.[18] Dr. Rogers did not prepare a report analyzing the MMPI data and was not called as a defense witness at trial, but furnished her raw data and notes to defense counsel, who then provided the data and notes to Morales and Edwards. On one page of the report, Rogers had written the phrase "probable fake bad."

Dr. Morales, in response to questions on cross-examination regarding Dr. Rogers's notes, testified that the MMPI notes containing raw data "made no sense to him because he was not a licensed psychologist." In response to questioning regarding the meaning of the phrase "probable fake bad," Morales testified that he was not familiar with the term and that he had not contacted Rogers to inquire into its meaning. Similarly, during cross-examination, the prosecution asked Dr. Edwards whether she had examined Rogers's MMPI data and notes. Edwards testified that she reviewed the psychological reports only long enough to ascertain that the reports were raw data, and that she does not rely on another professional's "raw data" when making evaluations if no report analyzing that data has been prepared. In response to the prosecution's inquiry regarding the meaning of the phrase "probable fake bad," Edwards testified that the phrase had multiple meanings, and that malingering was not the only possibility. Edwards also testified that she did not attempt to contact Rogers.

After the defense rested, the prosecution called Dr. Rogers to testify as a rebuttal witness and questioned her regarding the meaning of the phrase "probable fake bad." Rogers testified that her assistant had administered an MMPI to defendant in October 1990, and that Rogers had reviewed the test and made some notations, including writing the term "probable fake bad." Rogers explained that the term "may mean one of several things. What it always means is that probably the person has over responded in some way. There may have been some exaggeration or overstatement of whatever this person's current psychiatric condition is." Rogers also testified that the term would be "one thing you would consider" when considering the possibility of malingering. Defense counsel did not cross-examine Rogers.

---

[18] Rogers testified that the MMPI is "a 567 item true-false-type instrument for measuring personality functioning. It's used with psychiatric patients . . . . But it's basically used to measure overall personality functioning."

In closing argument, the prosecution emphasized Rogers's notation, observed that the defense experts had not wanted to consider the data, and stated with reference to this information that defendant controls the defense and "chooses to fabricate, fake, embellish and create."

Defendant asserts the trial court erred in permitting the prosecutor to cross-examine Drs. Morales and Edwards regarding the "probable fake bad" notation, because both experts testified they had not relied upon the MMPI data in forming their conclusions, and their testimony regarding the raw data therefore was irrelevant. Defendant further contends that Dr. Rogers's preliminary test scores and notations constituted inadmissible hearsay. Defendant urges that the prejudicial nature of the data and the notation outweighs their probative value as a basis for expert opinion, and accordingly the evidence should have been excluded altogether.

The Attorney General contends that defendant has forfeited the issue, because defense counsel failed to object to each prosecutorial question regarding the MMPI. We find no forfeiture. Defense counsel repeatedly objected to the prosecution's questions regarding the MMPI and the "probable fake bad" notation during the questioning of both Dr. Morales and Dr. Edwards, variously contending that the questioning was irrelevant, argumentative, and beyond the scope of the direct examination. The trial court overruled all those objections. The issue was not forfeited by counsel's failure to object to each and every question posed on the issue of the MMPI, because it is clear that further objections would have been unsuccessful.

■ On the merits of the claim, we conclude the trial court did not abuse its discretion in permitting the prosecution to cross-examine Dr. Morales and Dr. Edwards regarding their evaluation of the MMPI raw data and Dr. Rogers's notations, including the term "probable fake bad." First, the line of questioning was not irrelevant. Although both experts testified they had not utilized the MMPI results in evaluating defendant's sociological and psychological state of mind, both acknowledged having reviewed the raw data and notations before concluding the information was of no use to them. "A party 'may cross-examine an expert witness more extensively and searchingly than a lay witness, and the prosecution was entitled to attempt to discredit the expert's opinion. [Citation.] In cross-examining a psychiatric expert witness, the prosecutor's good faith questions are proper even when they are, of necessity, based on facts not in evidence. [Citation.]' " (*People v. Wilson* (2005) 36 Cal.4th 309, 358 [30 Cal.Rptr.3d 513, 114 P.3d 758], quoting *People v. Dennis* (1998) 17 Cal.4th 468, 519 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) Here, the trial court properly allowed the prosecutor to inquire as to both experts' reasons for disregarding the MMPI data as well as Rogers's "probable fake bad" notation.

The trial court also did not abuse its discretion in allowing the prosecution to call Dr. Rogers in rebuttal and to question her regarding the meaning of the phrase "probable fake bad." Both Dr. Morales and Dr. Edwards testified that they reviewed the raw data and rough notes prepared by Rogers, but that they either did not understand the data and notes, in the case of Morales, or understood but disregarded them as meaningless, in the case of Edwards. Because the defense expert witnesses questioned the relevance and usefulness of the psychological testing notes they reviewed, the prosecution was entitled to question Rogers concerning the circumstances surrounding the testing, including the various meanings of the term "probable fake bad." (*People v. Cooper* (1991) 53 Cal.3d 771, 824 [281 Cal.Rptr. 90, 809 P.2d 865].)

Even if the court had erred in allowing the prosecution to present evidence of the "probable fake bad" notation for the truth of the matter asserted (that is, to establish that defendant was malingering), any such error would not have been prejudicial. The court stated on three occasions that the evidence was being received only for the purpose of indicating the basis for the witness's opinion. Moreover, the testimony regarding the MMPI was relatively brief, as was the prosecution's mention of the issue during closing argument. Dr. Morales testified he did not understand the data and was not qualified to interpret MMPI tests. Nothing in his testimony would lead the jury to find that Dr. Rogers's notation was conclusive evidence of defendant's malingering. Similarly, although Dr. Edwards testified regarding her understanding of the meaning of "probable fake bad" and acknowledged that in some circumstances the phrase could indicate malingering, she also testified that there were many other meanings for the phrase, and that it was meaningless to her and of no use in her evaluation because the notation was raw data and was unaccompanied by a psychologist's report. In addition, Rogers testified that the phrase "probable fake bad" had multiple meanings other than that defendant was malingering. Moreover, in closing argument, defense counsel again told the jury that the term "probable fake bad" was meaningless because it was being discussed out of context and should be disregarded.

Additionally, the jury was given a limiting instruction—prior to Dr. Morales's testimony, again during his testimony, and a third time in the final instructions—informing them that the statements made by an expert in the course of examining defendant could be considered only for the limited purpose of disclosing the information upon which the expert based his or her opinion, and that such statements were not to be considered as evidence of the truth of the facts related in the expert's testimony. We presume the jury followed these instructions, and defendant has not rebutted this presumption. (*People v. Boyette* (2002) 29 Cal.4th 381, 453 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

We also reject defendant's assertion that it was error to admit testimony concerning the "probable fake bad" notation because this evidence was more prejudicial than probative. All three defense experts testified that the phrase "probable fake bad" had multiple meanings aside from a conclusion that a defendant was malingering. Additionally, as noted, the jury was instructed that this testimony should not be considered as evidence of the truth of the facts discussed in the expert's testimony. In view of the inconclusive nature of the expert's testimony regarding the meaning of the phrase, and the limiting instruction given to the jury, this testimony, even if it had been admitted in error, would not have been prejudicial. There is no reasonable likelihood that the testimony in question influenced the jury's verdict or that the outcome of the case would have been different had the court limited the scope of Dr. Rogers's testimony or Drs. Morales's and Edwards's cross-examination. (*People v. Brown, supra,* 46 Cal.3d at p. 448.)

### 4. *Admission of Evidence of Juvenile Misconduct*

Defendant contends the trial court erred in overruling defendant's objections to certain aspects of the prosecution's cross-examination of Dr. Morales, during which Morales was asked a series of questions regarding his conclusion that defendant did not suffer from antisocial personality disorder.[19] During questioning, Morales briefly and generally described defendant's juvenile history of petty theft and fighting, to which he also had alluded on direct examination in referring to defendant's history of "stealing, lying, burglary, [and] running away." Defendant contends the questioning of Morales regarding defendant's prior acts of misconduct "raised the specter that Ms. Alfaro had a history of bad conduct relevant to the jury's determination as to whether she should live the rest of her life out in prison or be sentenced to die."

Although defense counsel objected several times during the prosecution's examination on the grounds that the questions were argumentative, vague and ambiguous, or assumed facts not in evidence, none of the defense objections asserted that the prosecution improperly introduced evidence of defendant's prior misconduct. Accordingly, the issue has been forfeited. (Evid. Code, § 353, subd. (a); *People v. Alvarez, supra,* 14 Cal.4th at p. 186.)

Even if the issue had been preserved for review on appeal, we would conclude that defendant's claim is without merit. During its closing argument, the prosecution told the jury that the statutory aggravating factors relating to prior felony convictions and prior violent conduct were inapplicable in this

---

[19] Prior to her commission of the present offenses, defendant had no record of criminal activity involving the use or attempted use of force or violence or the express or implied threat to use force or violence.

case. Additionally, the trial court specifically instructed the jury to disregard any evidence of defendant's prior misconduct when considering aggravating circumstances. Again, we presume the jury followed these instructions, and defendant has not demonstrated otherwise. (*People v. Boyette, supra,* 29 Cal.4th at p. 436.)

### 5. *Prosecutorial Misconduct*

Defendant raises numerous claims of prosecutorial misconduct relating to the retrial of the penalty phase. She contends the prosecutor committed prejudicial misconduct by (1) eliciting evidence of defendant's juvenile misconduct through the reference in the direct examination of investigator Tom Giffin to the term "Cal. I.D. hit" as it related to his arrest of defendant; (2) eliciting evidence of defendant's juvenile misconduct during the cross-examination of Morales; (3) eliciting evidence that defendant was a "bad mother" by questioning Morales regarding his awareness that defendant allowed "ex-cons" to babysit her children; (4) asserting during closing argument that defendant lacked remorse for her crimes; (5) soliciting evidence of intent to kill during redirect examination of the coroner; (6) denigrating defense expert witnesses Dr. Consuelo Edwards and Marc Taylor, and insinuating that defendant's third-party-involvement defense was created only after she acquired a defense team; (7) mischaracterizing the law in a remark to a prospective juror during voir dire; (8) mischaracterizing the law with regard to defendant's burden of proof; and (9) inflaming the jury's passions during closing argument.

■ A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; see *People v. Cash* (2002) 28 Cal.4th 703, 733 [122 Cal.Rptr.2d 545, 50 P.3d 332].) Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. (*People v. Frye* (1998) 18 Cal.4th 894, 969 [77 Cal.Rptr.2d 25, 959 P.2d 183].) In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review. (*People v. Earp* (1999) 20 Cal.4th 826, 858 [85· Cal.Rptr.2d 857, 978 P.2d 15].)

With regard to defendant's contentions concerning the prosecution's cross-examination of Dr. Morales, and the alleged denigration of Dr. Edwards, it is not misconduct to question a defense expert's veracity. (*People v. Clark* (1993)

5 Cal.4th 950, 1017 [22 Cal.Rptr.2d 689, 857 P.2d 1099] (*Clark*).) Even if the prosecution's questions and comments suggesting that the defense experts were deceitful and that defendant had been coached to provide a false story that she had been raped as a child were improper, they were not so deceptive or reprehensible as to render defendant's penalty phase retrial a denial of due process. In any event, the trial court sustained defendant's objections to both lines of questioning, thereby limiting the possible prejudicial effect of the prosecutor's questions and comments.

As to defendant's remaining claims of misconduct, she made no objection and sought no curative admonition at trial, and accordingly has forfeited each of these claims. (*People v. Crew* (2003) 31 Cal.4th 822, 839 [3 Cal.Rptr.3d 733, 74 P.3d 820]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1001 [108 Cal.Rptr.2d 291, 25 P.3d 519].) Even had defendant objected at trial and thus preserved the remaining claims for review on appeal, they provide no basis for reversal. The prosecution's inquiry concerning the meaning of "Cal. I.D. hit" was logical and appropriate, because it was unlikely any juror would have been familiar with the term.[20] Giffin did not refer to defendant's arrest record, and the prosecution did not attempt to elicit such information.

The prosecution's cross-examination similarly was proper. During his testimony on direct examination, Dr. Morales referred to defendant's acts of misconduct, and the prosecution's related questions constituted permissible impeachment of Morales's testimony that defendant was not malingering and did not suffer from antisocial personality disorder. The prosecution's comment during closing argument concerning defendant's lack of remorse, made in the context of reviewing possible mitigating factors, was proper. (*People v. Williams* (1997) 16 Cal.4th 153, 254 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Likewise, the inquiry made of the coroner regarding defendant's intent to kill was not improper, and even if it had been improper, it would have been harmless because the guilt phase jury already had determined that defendant was guilty of killing the victim, and defendant in her videotaped confession (viewed by the jury) had told the police she intended that fatal result. The prosecution's questions regarding criminalist Marc Taylor's qualifications and testing methods were permissible—as noted above, it is not misconduct to question a defense expert's veracity. (*Clark, supra*, 5 Cal.4th at p. 1017.) The reference to defendant's third-party-involvement defense having arisen only after a defense team was assembled constituted a fair comment on the

---

[20] Giffin testified that he had obtained a "Cal. I.D. hit" on a fingerprint lifted from the bathroom where the victim was murdered. The prosecution questioned Giffin regarding the meaning of this term. In response, Giffin explained that it referred to "a computerized fingerprint system in the State of California that has in its data base people that have been arrested in the State of California. And when an unknown fingerprint is entered into the base, it compares the points of identification with the known fingerprints in the data base, and it puts out a list of potential matches."

evidence in view of the circumstance that, during the course of defendant's four-hour videotaped confession, she repeatedly rejected the contention that a third party participated in the murder. In closing argument, the prosecution expressly informed the jury that the People bore the burden of proof in the case, thus belying defendant's contention that the opposite message was conveyed. Finally, the prosecution's reference during closing argument to "every parent's nightmare," and the display of the crime scene photograph of Autumn Wallace's body, were not improper. The prosecutor was entitled to comment upon the gravity of the offense, and the argument was fair and legitimate. (*People v. Sanders* (1995) 11 Cal.4th 475, 551 [46 Cal.Rptr.2d 751, 905 P.2d 420].)

Defendant contends that cumulative prejudice resulted from a pervasive pattern of misconduct by the prosecution and that such misconduct rendered defendant's penalty phase trial fundamentally unfair, requiring reversal of the penalty judgment. Having rejected each of defendant's claims of misconduct, we reject her claim that she was prejudiced by the cumulative impact of the alleged misconduct.

### 6. *Constitutionality of California's Death Penalty Statute*

Defendant raises numerous constitutional challenges to California's death penalty statute, claims we consistently have rejected and find no persuasive reason to reexamine.

We repeatedly have rejected the contention that California's 1978 death penalty statute unconstitutionally fails to narrow in a meaningful manner the class of death-penalty-eligible defendants, and we have concluded that section 190.2 adequately narrows the class of murders for which the death penalty may be imposed. (*People v. Snow* (2003) 30 Cal.4th 43, 125 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Frye, supra,* 18 Cal.4th at p. 1029.) We also have rejected claims that the death penalty statute unconstitutionally grants unfettered discretion to prosecuting officials to decide whether to charge eligible defendants with a capital offense, thereby resulting in disparate imposition of the death penalty throughout the state. (*Vieira, supra,* 35 Cal.4th at p. 304; *People v. Lucas* (1995) 12 Cal.4th 415, 477 [48 Cal.Rptr.2d 525, 907 P.2d 373].)

Defendant contends section 190.3, factor (a) is unconstitutional as applied, because it is susceptible of "arbitrary, wanton and freakish" application. We repeatedly have held that consideration of the circumstances of the crime under section 190.3, factor (a) does not result in arbitrary or capricious imposition of the death penalty. (*People v. Harris* (2005) 37 Cal.4th 310, 365 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *People v. Brown* (2004) 33 Cal.4th 382,

401 [15 Cal.Rptr.3d 624, 93 P.3d 244] (*Brown*).) As in *Brown*, defendant argues that a seemingly inconsistent range of circumstances can be collected from decisions upholding imposition of the death penalty. As we observed in *Brown*, however, "[w]hat this reflects is that each case is judged on its facts, each defendant on the particulars of his offense. Contrary to defendant's position, a statutory scheme would violate constitutional limits if it did not allow such individualized assessment of the crimes but instead mandated death in specified circumstances." (*Brown, supra*, at p. 401.) We also have rejected defendant's contention that the court must specify which factors under section 190.3 apply in aggravation and which in mitigation. (*People v. Osband* (1996) 13 Cal.4th 622, 694 [59 Cal.Rptr.2d 356, 927 P.2d 713]; *People v. Espinoza* (1992) 3 Cal.4th 806, 827 [12 Cal.Rptr.2d 682, 838 P.2d 204].)

Defendant asserts that factor (d) ("extreme mental or emotional disturbance") within the list of mitigating factors under section 190.3 (and in CALJIC No. 8.85; see also Judicial Council of Cal. Crim. Jury Instns. (2006–2007) CALCRIM No. 763) unconstitutionally precludes the jury from considering mental or emotional disturbance that is less than "extreme" in mitigation of penalty. We repeatedly have rejected this contention, explaining that section 190.3, factor (k), the so-called catchall provision, is the statutory factor under which " ' "consideration of nonextreme mental or emotional conditions" ' " clearly is permitted. (*Stanley, supra*, 39 Cal.4th at p. 963; see *People v. Nicolaus* (1991) 54 Cal.3d 551, 586 [286 Cal.Rptr. 628, 817 P.2d 893].)

Defendant contends the death penalty law is unconstitutional in failing to require that the jury be instructed on certain burdens and standards of proof as to aggravating and mitigating evidence. It is settled, however, that California's death penalty law is not unconstitutional in failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the comparative weight of aggravating and mitigating circumstances, or the appropriateness of a sentence of death. (*Stanley, supra*, 39 Cal.4th at p. 963; *Brown, supra*, 33 Cal.4th at p. 401; *People v. Lenart* (2004) 32 Cal.4th 1107, 1136 [12 Cal.Rptr.3d 592, 88 P.3d 498]; *People v. Hillhouse* (2002) 27 Cal.4th 469, 510–511 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

Defendant's remaining contentions all are without merit. The jury need not determine the existence or nonexistence of every aggravating factor set out in section 190.3 before returning a verdict of death (*People v. Cook* (2006) 39 Cal.4th 566, 603 [47 Cal.Rptr.3d 22]; *People v. Prieto* (2003) 30 Cal.4th 226, 262–263 [133 Cal.Rptr.2d 18, 66 P.3d 1123]), and need not prepare written findings identifying the aggravating factors upon which it relied (*People v.*

*Jurado* (2006) 38 Cal.4th 72, 144 [41 Cal.Rptr.3d 319, 131 P.3d 400]; *Yeoman,* *supra,* 31 Cal.4th at p. 165). Finally, there was no error in failing to inform the jury that it had the discretion to decline to impose the death penalty even if it found no evidence in mitigation. (*Cook, supra,* 39 Cal.4th at p. 603.)

### 7. *Violations of International Law*

Defendant contends she was denied the "right to a fair trial by an independent tribunal and the right to protection against the arbitrary deprivation of life and the discriminatory application of a state's criminal laws" established by customary international law and the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the American Declaration of the Rights and Duties of Man. We assume, without deciding, that defendant has standing to invoke provisions of the international charters and agreements upon which she relies. (See *Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331 [165 L.Ed.2d 557, 126 S.Ct. 2669]; *Breard v. Greene* (1998) 523 U.S. 371, 377 [140 L.Ed.2d 529, 118 S.Ct. 1352].) Defendant's claim lacks merit, because she was not denied a fair trial or subjected to racial discrimination. " ' "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." ' " (*People v. Cornwell* (2005) 37 Cal.4th 50, 106 [33 Cal.Rptr.3d 1, 117 P.3d 622]; see *People v. Harris, supra,* 37 Cal.4th at p. 366.)

### 8. *Denial of Automatic Application for Modification of the Death Verdict*

Section 190.4 provides for an automatic motion to modify the jury's death verdict. Pursuant to this statute, the trial court rules on the motion after independently reweighing the evidence supporting the aggravating and mitigating factors (§ 190.3) and determining whether in the court's independent judgment this evidence supports the death verdict. (*People v. Steele* (2002) 27 Cal.4th 1230, 1267 [20 Cal.Rptr.2d 432, 47 P.3d 225].) This court then independently reviews the trial court's ruling in light of the record, "but we do not determine the penalty de novo." (*Ibid.*)

Defendant contends the trial court improperly failed to consider as mitigating factors the absence of criminal activity involving the attempted use of force or violence (§ 190.3, factor (b)) and the absence of any prior felony conviction (§ 190.3, factor (c)). Although the trial court recognized that the aggravating factors of prior felonies and violent criminal activity were not present, defendant urges that the court should have gone further and considered the absence of prior felonies or violent criminal activity as factors in mitigation. Defendant further contends the trial court improperly discounted

or ignored defendant's youth and troubled background, her intoxication at the time of the murder, her mental disabilities, and the evidence suggesting that she acted under the substantial domination of another person in committing the murder. Defendant urges that each of these circumstances was mitigating and that the trial court therefore improperly failed to modify the jury's death verdict to life imprisonment without the possibility of parole.

In denying the automatic motion for modification of the verdict, the trial court considered each factor set forth in section 190.3, finding that neither factor (b) nor (c) was present. The trial court further found that, although some evidence indicated that defendant committed the offense while under the influence of extreme mental or emotional disturbance (§ 190.3, factor (d)), the evidence was "insubstantial to justify a finding that this factor is present."

With regard to section 190.3, factor (g), whether defendant acted under extreme duress or under the substantial domination of another person, the court acknowledged that the jury had heard evidence that defendant committed the murder under the substantial domination of the second man. After observing that defendant had multiple opportunities to implicate another person during the course of her confession to Investigator Giffin, but failed to do so until she was represented by counsel, and noting the utter lack of physical evidence to support the presence or participation of another person in the murder, the court concluded that "the evidence is grossly insufficient to even raise [the participation of another person in the murder] as a strong inference in this case, especially when you consider the numerous opportunities Mr. Giffin gave [defendant] on the videotape."

With regard to section 190.3, factor (i), the age of the defendant at the time of the crime, the court acknowledged that the circumstance that the defendant was 18 years of age when she committed the crime might be a mitigating factor, but concluded that nonetheless there was no mitigation in this case because "you have to put the age in context of what her background shows." The court observed that defendant was a high school dropout who had been on the streets and involved with the drug culture for a substantial period of time. The court concluded that in a "streetwise" sense, defendant was "more mature" than her age would indicate.

Finally, with regard to section 190.3, factor (k), concerning extenuating circumstances of the crime, the trial court considered defendant's disadvantaged background, her early involvement with drugs, and her troubled relationships with her own father and with the fathers of her own children. The court found no mitigation, however, because although defendant was a young mother, she "chose to use drugs. She chose to engage in acts of prostitution on the streets. She chose to hang out in the area . . . where . . .

the drug culture is involved." Ultimately, the trial court concluded that defendant's background had no substantial weight, because defendant's drug and prostitution history were products of her own free will.

In reviewing the circumstances of the crime, the court remarked that the murder of Autumn Wallace was "one of the most senseless, brutal, vicious, callous killings that this court has ever seen." The court concluded that not having found the presence of any mitigating factors, the "circumstances of the crime itself standing alone far outweigh any mitigating circumstances, if there are any, that are presented in this case."

In ruling upon a motion to modify, " '[t]he trial judge's function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict. [Citations.]' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1161 [40 Cal.Rptr.3d 118, 129 P.3d 321], italics omitted.) The trial court is not required to find that evidence offered in mitigation does in fact mitigate. (*People v. Scott* (1997) 15 Cal.4th 1188, 1222 [65 Cal.Rptr.2d 240, 939 P.2d 354].)

In the present case, the record indicates the trial court considered all of the evidence offered in aggravation and mitigation. The court noted the evidence of defendant's age and troubled background, her intoxication on the day of the murder, and her lack of felony convictions or history of violent criminal conduct. The court then independently weighed the evidence of aggravating and mitigating circumstances and found, as stated above, that the evidence of aggravating circumstances substantially outweighed that of mitigating circumstances. The court concluded that the findings of the jury were appropriate in light of the evidence presented. The trial court is not required to do more. (*People v. Guerra, supra,* 37 Cal.4th at p. 1163; *People v. Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627].)

### 9. *Ruling on Motion for New Trial*

Section 1181, subdivision 7 allows the trial court to modify a verdict and impose a lesser punishment without granting or ordering a new trial if the court concludes that a "verdict or finding is contrary to [the] law or [the] evidence." Defendant asserts the trial court erred by failing to consider, in connection with her motion for a new trial, evidence that was not presented to the jury but which was known to the court. Defendant contends that because not all of the available mitigating evidence was presented to the jury, its determination that the aggravating factors outweighed the mitigating factors is "contrary to evidence." Specifically, defendant claims that the trial court

breached its duty to consider evidence described in the probation officer's report and the materials submitted with that report, such as the defense investigator's report and a comparative study of the proportional review of other sentences imposed in various cases. She asserts that information in these materials, such as a reference to a letter written by defendant to Linda Wallace expressing remorse, tended to establish defendant's remorse. Additionally, defendant contends other comments made in the probation officer's report confirming defendant's difficulties in school and her problems with drug abuse provided evidence in mitigation that had not been presented to the jury but that should have been considered by the trial court in ruling on the section 1181, subdivision 7 motion. Defendant also contends the trial court should have considered the circumstance that defendant demonstrated remorse in seeking to plead guilty unconditionally, but was prevented by her attorney from doing so.

The trial court did not err in its consideration of defendant's motion for a new trial. Prior to ruling upon defendant's motion, the court stated it had considered the information submitted with the probation officer's report— information it appropriately had not previously considered in denying defendant's motion to modify the verdict pursuant to section 190.4. Moreover, evidence contained in the probation officer's report and supporting materials (documenting defendant's drug abuse history, difficulty in school, and expressions of remorse) was duplicative of evidence presented at trial and thus already had been evaluated by the trial court in its ruling on defendant's motion to modify the verdict. Finally, even if the trial court erroneously failed to consider evidence of defendant's desire to plead guilty unconditionally in ruling upon defendant's motion under section 1181, subdivision 7, such error would have been harmless, because abundant evidence of defendant's remorse was presented at trial and was evaluated by the trial court in ruling upon defendant's posttrial motions.

Although the trial court's rejection of defendant's motion for a new trial makes reference to its ruling denying defendant's motion for modification of the verdict, we infer from the record of the hearing that the court properly discharged its separate duty to conscientiously consider the motion for new trial. The transcript of the hearing on the latter motion reveals that the court considered both the evidence presented at trial and the evidence contained in supplemental materials that had not been presented to the jury. The hearing transcript reveals that the court carefully considered defendant's claims before ruling on the motion for new trial. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1063 [47 Cal.Rptr.3d 467, 140 P.3d 775].) "Because no manifest or unmistakable abuse of discretion appears, we will not disturb the ruling on appeal." (*Ibid.*)

## III. Disposition

We affirm the judgment in its entirety and deny defendant's requests for modification of the verdict and for a stay of execution.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied October 24, 2007.