Filed 6/4/14  P. v. Fazel CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C069689 |
| Plaintiff and Respondent, | (Super. Ct. No. 05F10182) |
| v. | |
| NAZIR AHMAD FAZEL, | |
| Defendant and Appellant. | |

Defendant Nazir Ahmad Fazel appeals from his conviction of first degree murder. His sole contention on appeal is prosecutorial misconduct.  He claims the prosecutor impugned defense counsel's integrity and committed misconduct during closing argument when he suggested defense counsel had asked a witness a particular question without any factual basis.  We disagree and affirm the judgment.

FACTS

Rabia and Mohammad Samimi were married in Afghanistan in 1973 when she was 14 years old and he was 29.  They and their three children immigrated to California

1

in 1981 and settled first in Hayward and then in Newark. They opened a pizza restaurant called Super Pizza. Their oldest son was killed in a car accident in 1993.

The Samimis became acquainted with defendant and his family in late 1993 or early 1994, and the two families became friends. Defendant worked as a videographer, making videos of weddings and special occasions. Unknown by Rabia, defendant had taken many pictures of her. He showed them to her and told her he was obsessed with her. He began calling her, and told her if she would not see him, he would "take" her remaining son. Rabia believed he was capable of doing something to her son. The two began a sexual affair.

Defendant continued to threaten Rabia. In 1996, defendant and Mohammad had committed insurance fraud. They intentionally vandalized the Samimi's Super Pizza restaurant, and they recovered $43,000 in insurance proceeds. Rabia was aware of the fraud, and she lied to the insurance agent to protect her family.[1] Defendant threatened to expose the fraud unless Rabia continued to have sex with him.

Unknown by Rabia, he had secretly recorded the two of them having sex. He was in need of money, and he threatened to show the video to Mohammad unless she gave him money and continued to have sex with him.

Defendant left his wife and children. The affair with Rabia continued until about 2000, when defendant moved to Germany. He lived there for two years. He called her often during the first year, but not during the second.

The Samimis moved to Elk Grove in 2001. They opened a market, and Rabia also worked at a department store. In 2002, defendant appeared at Rabia's work. He told her he loved her and could not be without her. Their affair resumed.

---

[1] Rabia testified under a grant of immunity concerning the insurance fraud.

Defendant wanted Rabia to leave Mohammad. Rabia told him she never wanted to leave her husband. At one point in 2003 or 2004, defendant was upset over not having enough money for rent, and he asked Rabia for it. She told him she did not have any money. Defendant grabbed an object wrapped in a yellow towel and told Rabia to look at it. She opened the towel and saw a small gun and a box of bullets. Defendant said if she did not leave her husband, he would kill her, her husband, and himself.

In May 2005, Rabia and Mohammad separated. Rabia had caught Mohammad in an affair. Defendant forced her to file for divorce, which she did that month. On October 12, 2005, Rabia confessed her affair with defendant to Mohammad, and the two agreed to reconcile.

Defendant was employed part-time in a Fremont restaurant owned by his friend, Abdul Andesha. Defendant helped with waiting tables and catering. When he helped with catering, he would use the restaurant's Ford van.

Defendant was very upset that Rabia had reconciled with Mohammad. He told Andesha he had lost his life, his marriage, and his prestige because of Rabia. On October 13, 2005, he drove to the Samimi's home in Elk Grove. After seeing defendant at her home, Rabia decided to obtain a restraining order against him. She received a hearing date of November 10, 2005.

On October 14, 2005, defendant met with Mohammad and showed him a videotape of defendant and Rabia having sex. He hoped that by showing the videotape, Mohammad would let Rabia go. Mohammad, however, said he did not want a divorce. Defendant was shocked at Mohammad's response.

Defendant called Rabia every day from October 13 through November 10, 2005, but she did not speak with him.

On November 8, 2005, Andesha reported to police that his restaurant's Ford van was missing. He suspected defendant had taken it, and he told the police defendant was

3

desperate.  On November 9, 2005, defendant asked Andesha if the police had found his van.  Andesha noticed defendant had lost weight and grown a "black and white beard."

On the morning of November 10, 2005, the day scheduled for Rabia's hearing for a restraining order against defendant, Mohammad and Rabia were outside in front of their home when defendant ran up to Mohammad, and the two men started fighting.  Defendant shot Mohammad three times.  He then walked quickly to the street corner and drove away in a "painted-over" black utility van.  Mohammad died from gunshot wounds to his chest and left arm.

Later that month, Andesha received a package in the mail that included the key to his van and a note written by defendant.  In the note, written in native Dari or Farsi, defendant asked for forgiveness and told Andesha where he could find his van in Tracy.  Sheriff's deputies found inside the van a disposable razor and a sales receipt for its purchase as part of a set of disposable razors.  The receipt was from a Sacramento retail store and was dated November 10, 2005, at 5:14 p.m.  Deputies also noticed the words on the van had been painted over.

On March 5, 2010, more than four years later, an FBI agent took defendant into custody in the nation of Georgia and accompanied him to the United States.  A jury convicted defendant of first degree murder (Pen. Code, § 187, subd. (a)), and it found defendant had intentionally and personally discharged a firearm in the commission of the offense, causing death.  (Former Pen. Code, § 12022.53, subds. (b), (c), and (d).)  The trial court sentenced defendant to state prison for 50 years to life:  25 years to life on the murder count and a consecutive 25 years to life on the firearm allegation.

## DISCUSSION

### Prosecutorial Misconduct

Defendant contends the prosecutor committed prejudicial misconduct during rebuttal argument.  He asserts the prosecutor impugned defense counsel's integrity when he discussed why counsel may have asked Rabia Samimi about having an Iranian

4

boyfriend prior to Mohammad's death.  Defendant asserts the prosecutor's comments accused counsel of asking the question in bad faith and of fabricating evidence.  We disagree and find no misconduct.

*Additional background information*

While cross-examining Rabia Samimi, defense counsel introduced the notion of an Iranian boyfriend.  He asked Rabia:

"Q  Any time in 2004 or particularly in 2005, did you become interested in an Iranian gentleman as a perhaps friend or love interest?

"A  Iranian gentleman?

"Q  Yes.

"A  No.

"Q  Not at all?

"Q  Not at all."

During his rebuttal closing argument, the prosecutor addressed defendant's theories of the case, and he highlighted defense counsel's question about an Iranian.  The reporter's transcript records the argument as follows:

[THE PROSECUTOR]:  "Now, of course, that's not the defense version of events.  [Defense counsel], during the course of his argument, says that there's three possible contexts here:  His guy did it.  [Defense counsel] is admitting the obvious, which is that there's just a ton of evidence to disregard.

"He also says another possibility is that he did it but he was put up to it by Rabia Samimi, which is a fascinating argument because it does not mean that his client is not guilty of anything, and if anything, that he is guilty of first degree murder.  But, of course, it's not what his client testified to.

"And the last version is this:  SODDI, which constitutes: Some other dude did it. Not this guy, some other dude.

"Now, of course, [defense counsel], during the course of his argument, indicates that the burden is not on him to say who this is. The burden is always on the People. He doesn't have to say one way or the other, which is an interesting argument.

"But if you remember one part of his cross-examination of Rabia Samimi, he actually made a suggestion on who that other person might be: It was the Iranian.

"Now, it's funny if you think about it. This was for poor Rabia Samimi, probably the only point in time during the course of her entire direct and cross-examination where she cracked anything like a sad smile.

"Do you remember that question by [defense counsel]: In 2004 and 2005, did you have a relationship with an Iranian man?

"And, of course, she says no. That's just sheer nonsense.

"But if you think about it, if you were going to come up with a villain from central casting, what better thing to do than to pull up the Iranian? Scary people, these Iranians. We all know from these guys. These are the sorts of people you could be dreading in your sleep, the guys who are building atomic bombs in the Middle East and are someday going [to] cause havoc all over the world. Who better to throw out as a possible villain than the Iranian?

"But if you think about it, there is some method to the madness here, because what? Because [defense counsel] knows that you are not going to buy that Rabia Samimi pulled the trigger. That makes no sense at all.

"This crime was so brazen, it was committed in broad daylight in a residential street, with all kinds of people in their homes, who saw, what? A Middle Eastern man running in, a Middle Eastern man running away, a Middle Eastern man driving away.

"Okay. So he's got to think to himself: I have got to come up with something that's going to make sense that is not my client: I know. It's an Iranian.

"[DEFENSE COUNSEL]: I object. Counsel's not arguing the evidence. He's inferring that I made up the question out of the air.

6

"THE COURT: All right. Again, ladies and gentlemen, counsel are afforded some degree of latitude in argument. You should understand that the arguments of counsel are simply their interpretations of the evidence and the law.

"Go ahead.

"[THE PROSECUTOR]: The bottom line is this: He's got to come up with somebody who looks at least like his client and a man in order to proffer this SODDI defense. So this is what he does. He throws out the Iranian as the person who could be responsible for this.

"To which we can only say: Where is the evidence of this?

"You can't just speculate yourself out of this. You must base your evaluation, your verdict on evidence, not speculation.

"We don't even have any evidence from any source that she was dating an Iranian. That was a question thrown out to us by [defense counsel]. Nobody came in and testified to anything along those lines. There is no evidence from any source whatsoever that Rabia Samimi had a relationship with any other man at that point in time.

"Think about the context in which [defense counsel's] argument is being made. He's got to be saying that not only did Rabia Samimi falsely accuse his client of the murder of her husband, she knew who the real killer was, and she lied about it, okay? She didn't want that person held to justice. She was perfectly willing that the guilty party should get away with the murder of her husband just so she could frame the defendant.

"Well, that's an awful lot of speculation, frankly, ladies and gentlemen. There is no evidence to support any of this.

"It is the sheerest speculation. SODDI is not going to work or should not work in this case."

While the prosecutor was making this argument, he showed the jury a photo of the Ayatollah Khomeini and the former Iranian president, Mahmoud Ahmadinejad.

7

After the jury had been excused to deliberate, defense counsel asked the court to cite the prosecutor for misconduct, admonish the jury, and declare a mistrial. Counsel contended the prosecutor had impugned his integrity by suggesting to the jury he had asked the question about the Iranian without a good faith basis and had used the word "Iranian" because it was "loaded." Counsel stated he had a good faith belief for asking the question that he derived from the victim's family.

The trial court denied counsel's motion for mistrial and his request for an admonishment. It believed the prosecutor had intended to attack counsel's credibility, but it was not a direct attack on counsel's integrity. In the court's view, the prosecutor's argument was "simply a suggestion to the jury why that series of questions may have been asked."

*Analysis*

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144]; see *People v. Cash* (2002) 28 Cal.4th 703, 733.) Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328.) 'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' (*Ibid.*) When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' (*People v. Smithey* (1999) 20 Cal.4th 936, 960, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)" (*People v. Friend* (2009) 47 Cal.4th 1, 29.)

8

"It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense (*People v. Perry* (1972) 7 Cal.3d 756, 789-790; *People v. Bain* (1971) 5 Cal.3d 839, 845-847), or to imply that counsel is free to deceive the jury (*People v. Bell* (1989) 49 Cal.3d 502, 538.)  Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom. (*People v. Sandoval* (1992) 4 Cal.4th 155, 183-184, citing *People v. Thompson* (1988) 45 Cal.3d 86, 112.)

"Nevertheless, the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account.  (See *People v. Frye* (1998) 18 Cal.4th 894, 977-978 [no misconduct where prosecutor accused counsel of making an ' "irresponsible" ' third party culpability claim] [overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22]; *People v. Medina* (1995) 11 Cal.4th 694, 759 [no misconduct where prosecutor said counsel can ' "twist [and] poke [and] try to draw some speculation, try to get you to buy something" '].)  In so doing, the prosecutor may highlight the discrepancies between counsel's opening statement and the evidence.  (E.g., *People v. Gionis* [(1995)] 9 Cal.4th 1196, 1217.)  Misconduct claims also have been rejected where . . . the prosecutor criticizes the defense theory of the case because it lacks evidentiary support (e.g., *People v. Fierro* (1991) 1 Cal.4th 173, 212 & fn. 9 [overruled on another ground in *People v. Thomas* (2012) 54 Cal.4th 908, 941].)"  (*People v. Bemore* (2000) 22 Cal.4th 809, 846.)

The prosecutor's comments here were not a deceptive or reprehensible method to persuade the jury.  They aggressively, but not inappropriately, attacked the lack of evidence supporting a potential defense theory of the case.  They did not personally attack defense counsel's integrity or cast aspersions on him.

Defense counsel raised the theory of a different killer.  In his opening statement, counsel asserted the evidence would show that someone other than defendant killed

9

Mohammad. He stated Rabia had a motive to kill Mohammad, and that the evidence could show she had other love interests in the fall of 2005. Counsel stated the evidence would show Rabia was "capable of devising a nefarious scheme or plan."

In cross-examination, and pursuant to this theory, defense counsel asked Rabia whether she had had an Iranian boyfriend in 2005, the same year her husband was murdered. And despite Rabia's denial, counsel again mentioned the theory in his closing argument. Summarizing his theories, counsel stated: "I think the evidence could either be interpreted to show my client killed Mohammad Samimi, perhaps he killed Mohammad Samimi at the behest of Rabia Samimi, or that he did not kill Mohammad Samimi at all, that Rabia Samimi somehow orchestrated his demise."

The prosecutor was entitled to address counsel's theory that Rabia arranged for someone else to perform the murder and, in particular, to address the discrepancies between that theory and the evidence. The theory lost significant evidentiary support when Rabia denied having an Iranian boyfriend, and the prosecutor was free to place defense counsel's question in the context of counsel's theory for the jury to consider. His argument was aimed at the lack of supporting evidence, not counsel's integrity. We find no prosecutorial misconduct.

## DISPOSITION

The judgment is affirmed.


                                                    NICHOLSON          , J.

We concur:


      BLEASE          , Acting P. J.


      BUTZ          , J.


10